2019 IL App (1st) 162259
No. 1-16-2259
Opinion filed September 19, 2019

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10 CR 10481 |
| RASHAUN CARLISLE, | ) ) ) | The Honorable Gregory Robert Ginex, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Rashaun Carlisle, was found guilty by a jury of attempted murder after he used a sawed-off shotgun to shoot at police officers, and he was sentenced to 60 years with the Illinois Department of Corrections (IDOC).

¶ 2        In this appeal, defendant claims that the trial court erred by dismissing his *pro se* petition for postconviction relief as frivolous and patently without merit. Defendant claims that his petition stated the gist of a constitutional claim that he was denied effective assistance of appellate counsel when appellate counsel failed to include a claim that his trial

counsel was ineffective for failing to object to the publication in the jury room of photographs of a bloody police vest and radio.

¶ 3    A defendant raising a claim concerning appellate counsel "must show *both* that appellate counsel's performance was deficient *and* that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." (Emphases added.) *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). Thus, to succeed on the sole claim that he raises on appeal, defendant must show *both* (1) ineffective assistance of trial counsel *and* (2) ineffective assistance of appellate counsel. When reviewing a claim of ineffectiveness of appellate counsel, a reviewing court must consider *first* whether trial counsel was ineffective. *Petrenko*, 237 Ill. 2d at 501-02. Thus, in our analysis below, we consider *first* whether *trial* counsel was ineffective, even though the sole claim that defendant raises in this appeal is the ineffective assistance of his *appellate* counsel.

¶ 4    As we explain below, we cannot find ineffectiveness by either counsel, and thus, we must affirm.

¶ 5                                    BACKGROUND

¶ 6    We provide a detailed description of the testimony below, but in sum, the State's evidence at trial established that on May 8, 2010, at 2:50 a.m., defendant stood on the median strip of Mannheim Road near Division Street in Stone Park, Illinois,[1] and fired two rounds from a sawed-off shotgun at police officers Robert Vicari and Terry Carr, who were called to investigate a disturbance. Officer Vicari was wounded in the face and shoulder, and Officer Carr was not injured. Defendant fled the scene and was subsequently apprehended.

---

[1]Stone Park is a village in Cook County, Illinois.

¶ 7                                    I. Evidence at Trial

¶ 8            The State's evidence consisted of the testimony of eight witnesses: (1) a Stone Park police officer, Andrew Morales, who observed the shooting; (2) a Stone Park police officer, Robert Vicari, who was shot by defendant; (3) a Stone Park police officer, Terry Carr, Officer Vicari's partner; (4) a Cook County Sheriff's police officer, Sergeant Melvin Jenkins, who observed the shooting; (5) a Franklin Park police officer, Sergeant Michael Jones, the arresting officer; (6) Mark Pomerance, a forensic scientist who analyzed the shotgun used by defendant; (7) a Stone Park police detective, Christopher Pavini, who investigated the shooting; and (8) an assistant state's attorney (ASA), who interviewed defendant.

¶ 9                                A. Officer Andrew Morales

¶ 10           Police Officer Andrew Morales testified that at 2 a.m. on May 8, 2010, he was on patrol when he responded to a call to close a bar located in a strip mall on North Mannheim Road in Stone Park in response to complaints of gang activity. Morales was in uniform and was driving a marked police Ford Expedition. Morales was familiar with the bar as a frequent "hang out" location for the Latin Kings. Morales, joined by a number of other police officers at the strip mall, closed down the bar. The patrons of the bar were compliant with the officers' requests to vacate the premises, and the patrons promptly exited the bar and the bar's parking lot.

¶ 11           Morales then entered a liquor store located in the same strip mall to discuss nearby traffic issues with the liquor store clerk. An unidentified male entered the liquor store and complained that he was being harassed by an individual in front of the bar. At this time, the other officers involved in closing the bar had vacated the strip mall. However, Officer Carr and Officer Vicari arrived forthwith at the liquor store, and Morales instructed them to

investigate the disturbance in front of the bar. Carr and Vicari were dressed in "plain clothes," but they wore bulletproof vests outside of their clothes, with their police badges showing, and belts containing their firearms, handcuffs, and other equipment. They were driving an unmarked police Chevy Malibu.

¶ 12    Morales observed Carr and Vicari handcuff an individual who was shouting outside of the bar. Morales was standing outside of the liquor store, approximately 100 feet away from Carr and Vicari, when he heard two gunshots. Morales observed an individual standing in the median strip of Mannheim Road pointing a shotgun at Carr and Vicari,[2] who, besides the individual they had handcuffed, were the only people in the parking lot. Officer Morales returned the fire at the individual in the road, who promptly fled. Morales gave pursuit but did not apprehend the individual. Upon returning to the parking lot, Morales observed Vicari bleeding from his face.

¶ 13    Morales testified, on cross-examination, that when he exited the liquor store the individual creating the disturbance was yelling but that there was no one else in the parking lot. He further testified that his marked vehicle was in front of the liquor store and that neither of the two police vehicles in the strip mall parking lot had its Mars lights flashing. On redirect, Morales identified the sawed-off shotgun that the individual in the median of the street was holding. This exhibit was later admitted into evidence without objection.

¶ 14                            B. Officer Robert Vicari

¶ 15    Officer Robert Vicari testified that, on May 8, 2010, at 2 a.m., he received a call to proceed with his partner, Officer Terry Carr, to close down the bar on Mannheim Road in response to gang activity at the bar. Vicari's and Carr's bulletproof vests had the word

---

[2]Officer Morales later identified this individual as defendant.

"Police" written on the back, and the parking lot of the bar was well lit. After the bar and its parking lot were cleared, Vicari and Carr drove to a garage behind the bar to investigate a report of gang graffiti sprayed on the garage. After observing the graffiti, the two officers drove to the front of the strip mall, where Officer Morales directed Vicari and Carr to return to the bar, where an individual was causing a disturbance. The individual was intoxicated, agitated, and had apparently been arguing previously with "some other unknown male subject." Vicari handcuffed the individual for the officers' safety and began patting down the individual. Vicari then heard a gunshot, took cover, drew his firearm, and rose to return fire. Observing an individual in the median of Mannheim Road, about 60 feet away, he fired a second shot and then returned to cover. Vicari called on his police radio that shots had been fired both at and by the police. At this point, the handcuffed individual informed Vicari that Vicari had been shot in the face. To verify that information, Vicari wiped his left hand across his face and realized that "it was loaded with blood." Vicari then called on his radio, stating that he had "been shot in the face by a sawed-off shotgun," and that there was "a male Hispanic runner southbound Mannheim going eastbound on Division with a black hoodie and blue jeans on with a sawed-off shotgun."

¶ 16     Vicari testified that he still had five pellets in his face and one in his shoulder, and that doctors cannot remove the two pellets remaining in his left eye due to fear that the surgery could result in blindness.

¶ 17     Vicari testified that, at the time of the offense, he was wearing a bulletproof vest, with a two-way radio attached to it. The exhibits at issue in this appeal are the photographs marked People's Exhibit Nos. 12, 13, and 14, that depict Vicari's vest and radio. Prior to showing the photographs to Vicari, the ASA stated that he was showing them to defense

counsel. Defense counsel made no objection. With respect to these photos, Vicari then testified as follows:

"ASA: I'm going to show you picture Exhibit No. 12. Do you recognize that?

VICARI: Yes. It's my vest and my radio.

ASA: Okay. And now that was the radio and vest you wore on the evening the shooting took place, is that correct?

VICARI: That's correct.

ASA: Prior to the shooting was your vest and radio covered in blood?

VICARI: No, it was not.

ASA: Showing you No. 13, I'd ask if you recognize that.

VICARI: That's my vest.

ASA: And that's more of a close-up, correct?

VICARI: Yes.

ASA: And finally I will show you People's 14 and ask if you recognize that.

VICARI: Yes. It's my vest and my radio in a better shot.

ASA: And these pictures were all taken shortly after the shooting took place, is that correct?

VICARI: Correct."

¶ 18    The ASA then asked to "be granted leave to publish" the photographs to the jury, and defense counsel responded: "No objection." The trial court then received the exhibits in evidence.

¶ 19    Vicari testified again with respect to these exhibits, as follows:

"ASA: People's No. 12, that's a photograph, a close-up of your two-way radio, your microphone, is that correct?

VICARI: Yes.

ASA: And it's covered with blood, is that true?

VICARI: Yes.

ASA: People's No. 13, that again is the vest you told us about, correct?

VICARI: Correct.

ASA: And again, what I'm pointing to now in the center of the photograph is the blood that we've been talking about.

VICARI: Yes.

ASA: And finally People's No. 14 is an overall shot of your vest, as well as the microphone, is that correct?

VICARI: Yes."

¶ 20        On cross-examination, Vicari testified that, after the bar was cleared out, the only person left in the parking lot was the individual creating the disturbance. Vicari testified that before May 8, 2010, he did not know defendant and knew of no reason why defendant would be angry with him. Vicari confirmed that he gave a statement to Detective Pavini, and defense counsel then attempted to impeach Vicari, asking: "Isn't it true that you told him—" However, the State objected, and the trial court sustained the objection. No offer of proof was made by the defense.

¶ 21                                C. Officer Terry Carr

¶ 22        Officer Terry Carr testified that on May 8, 2010, at 2 a.m., he was partnered with Officer Vicari. Both officers were wearing bulletproof vests with "Police" written on the

7

back; their badges were on the front of the vests, and their duty belts, holding their equipment, were around their waists. Carr confirmed that, after the bar was closed, the parking lot was completely cleared. Carr testified that he and Vicari checked on some graffiti behind the bar and returned, at the behest of Officer Morales, to question an individual causing a disturbance in front of the bar. During the questioning, Carr heard a gunshot and felt glass ricochet around him. The glass was from the windows of the bar, which shattered upon being hit by pellets from the shotgun. Carr took cover, moved to the front of his police vehicle, and then observed a muzzle flash in the median of Mannheim Road. The muzzle flash was pointed directly at the two officers. Carr began to pursue the suspect; however, his pursuit ended when he heard Vicari on the radio reporting that he was shot. Carr then returned to Vicari and radioed that there was a "male black subject" running eastbound from Mannheim Road.

¶ 23    On cross-examination, Carr testified that prior to May 8, 2010, he did not know defendant and knew of no reason why defendant would be angry with him. Defense counsel asked Carr if it was possible that Carr had given a statement to Detective Pavini about this incident, and Carr replied that it was "[v]ery possible," but he did not recall it.

¶ 24                         D. Sergeant Melvin Jenkins

¶ 25    Sergeant Melvin Jenkins testified that on May 8, 2010, at 2:50 a.m., he was leaving the scene of an arrest and heading northbound on Mannheim Road when he heard a gunshot near the intersection of Mannheim Road and Division Street. As he heard the gunshot he observed a muzzle flash to his left. Jenkins slowed his vehicle and observed a second muzzle flash from the same position as the first muzzle flash. Jenkins observed that the individual shooting the shotgun was pointing the shotgun at "one marked police car, which was behind

another unmarked car. But I was able to notice that there were a couple of police officers and what appeared to be a citizen or someone that they had in custody near the back side of a marked vehicle." He did not observe any other individuals in the strip mall parking lot. Jenkins turned on his Mars lights and pursued the suspect while using a spotlight to illuminate the area. He drove to 39th Street and exited his vehicle, where a number of other law enforcement agencies arrived to surround the area in which the suspect had fled. Jenkins then received notification over his radio that the suspect was apprehended, and he identified the suspect in custody as the same man he observed fleeing the shooting; however, the suspect was no longer wearing a dark-colored "pullover" (sweatshirt) that he was wearing during the shooting. Jenkins searched the area and located a dark sweatshirt, which had been "stuffed" into a bush. Jenkins identified defendant as the suspect he observed shooting at Carr and Vicari.

¶ 26    On cross-examination, Jenkins testified that he could not positively state that the gun held by the suspect was pointing directly at the squad cars or officers. He could testify only that the gun was being pointed west and that this was in the same direction where the squad cars and officers were located.

¶ 27                                  E. Sergeant Michael Jones

¶ 28    Sergeant Michael Jones testified that, on May 8, 2010, just before 3 a.m., he was monitoring the radio at the Franklin Park police station. The Franklin Park Police Department shares a radio band with the Stone Park Police Department. He received a radio call that a Stone Park officer had been shot, and he and several other officers exited their police station to respond to the radio call. Upon arriving at the intersection of 39th Street and Division Street, Jones joined other officers in searching for the suspect involved in the shooting. Jones

observed defendant walking in the area and "looking back" while he was walking. Jones proceeded to take defendant into custody. On cross-examination, Jones testified that he was not at the bar when the shooting occurred and did not observe how many individuals were in the bar parking lot during the shooting.

¶ 29                                    F. Firearms Examiner Mark Pomerance

¶ 30          Mark Pomerance, a firearms examiner for the Illinois State Police, Division of Forensic Services, testified that he analyzed the sawed-off shotgun. The shotgun's double-barrel stock was sawed off, and the butt of the shotgun had also been shortened. On cross-examination, Pomerance testified that the shotgun was at least 50 years old and that he did remove the pellets from the shells he used during his examination to lessen the recoil of the shotgun. He also testified that he did not have any pellets to compare with and made his conclusion that a size six pellet was used during the shooting because the spent shotgun shells at the crime scene were marked size six.

¶ 31                                    G. Detective Christopher Pavini

¶ 32          Detective Christopher Pavini testified that, on May 8, 2010, at 2:50 a.m., he received a phone call at his home alerting him that an officer had been shot. He proceeded to 40th Street to aid in the search. During the search, Pavini recovered a discarded shotgun, which was then sent to the Illinois State Police in the same condition that it was found. Upon cross-examination, Pavini testified that he wrote a supplementary investigation report. Defense counsel then handed the report to Pavini, and the State requested a sidebar.

¶ 33          At the sidebar, defense counsel stated that he had a three-page supplementary investigation report by Detective Pavini stating that he had interviewed Officers Morales,

Carr,[3] and Vicari.[4] The ASA objected to the report, stating: "All three of those individuals took the stand. None of them were confronted about those statements." The ASA explained that the State had previously objected to defense counsel's questioning of these individuals about the report because counsel "just started reading from the report without asking [the witness] any questions." Defense counsel then asked if Officer Vicari could be brought back on the stand, and the State objected. The trial court sustained the State's objections, finding that defense counsel did not establish a foundation to introduce Detective Pavini's report into evidence.

¶ 34                          H. Defendant's Statement

¶ 35            An ASA testified that on May 8, 2010, at 8 a.m., she arrived at the Stone Park Police Department to interview defendant. She informed defendant that she was an ASA, that she was a lawyer working with the police, and that she did not represent defendant, and she read defendant his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1996). She then interviewed defendant and memorialized the interview, with defendant's permission, by writing down what defendant said, having defendant review the statement, and then having defendant sign each page of the statement. The statement was admitted into evidence without objection. The ASA then published the statement to the jury as follows:

          "[Defendant] states that on May 8th, 2010, in the early morning hours [his girlfriend] drove him to the liquor store near Mannheim Road and Division in Stone

---

[3]Officer Carr's statement in Detective Pavini's supplementary investigation report stated, in relevant part, "Carr stated the following in summary and not verbatim or in its entirety. *** Offender was in center lane of N/B Mannheim Rd. Carr began to run after offender ***."

[4]Officer Vicari's statement in Detective Pavini's supplementary investigation report stated, in relevant part, "Vicari stated the following in summary & not verbatim or in its entirety. Vicari stated there was a large group in front of [the bar] which OFC Morales told Vicari and his partner Carr to go check out. Vicari stated he came in contact with [individual creating a disturbance] who was screaming, swearing."

Park, Illinois. [Defendant] states that he is a regular at the liquor store. Meaning that he goes there a lot, and he knows that the liquor store is open until at least 4:00 o'clock a.m.

[Defendant] states that [his son] was inside the car in a car seat in the back seat when he arrived at the liquor store. [Defendant] states that the liquor store is next door to a nightclub. [Defendant] states that he bought a 40 ounce bottle of Milwaukee's Best Ice Beer from the liquor store.

[Defendant] states that he left the store and walked to his car, which was parked in the liquor store parking lot. As [his girlfriend] pulled out of the parking lot, she took a left onto Division Street in order to drive eastbound to their apartment on 34th Avenue.

As [defendant] left the parking lot, he saw one guy flash Latin King gang signs from the parking lot of the nightclub. [Defendant] states that when [his girlfriend] stopped at the stop sign on Division the Latin King continued to flash gang signs and yelled Kings.

[Defendant] states that he got out of the car and wanted to talk to the guy man to man because he didn't think he had to be harassed by them, and he didn't have to live like that. Especially because he hadn't done anything.

[Defendant] states that as he spoke with the one guy other cars kept pulling up. Three cars. And about 7 to 15 guys were there. [Defendant] states that he told them that he had a kid in the car and that he lived around there, and didn't a [*sic*] appreciate it, and that he wasn't on that. [*sic*] Meaning he/[defendant] wasn't a gangbanger.

12

[Defendant] states that, as he spoke with the initial guy, another guy punched him in the side of the face from the side. [Defendant] states that he fell down, and all of the guys who were male and Hispanic kicked him and stomped on him when he was on the ground.

[Defendant] states that all of the guys left, and he got back into the car and drove home with [his girlfriend]. [Defendant] states that it took them five minutes to get home. [Defendant] states that he was upset when he got home. [Defendant] states that he was mad that he got jumped by the Latin Kings.

[Defendant] states that he had a 12 gauge sawed off shotgun in his closet that he bought a couple years ago for $100. [Defendant] states that the shotgun was loaded with two rounds shotgun shells. [*sic*] [Defendant] states that he also had other shotgun shells in the closet, and that he put two additional shotgun shells in his pocket.

[Defendant] states that he was mad about what happened and walked back to the nightclub. [His girlfriend] tried to calm [defendant] down after [defendant] grabbed the shotgun. [Defendant] states that he wanted to shoot or hurt them because they, the Latin Kings, beat him up for no reason.

[Defendant] states that he walked from his house to Mannheim Road where the nightclub was with the loaded shotgun, which was about eight blocks. As [defendant] walked toward Mannheim Road, he cut through a parking lot and was walking east to west.

[Defendant] states that he stood in the northbound lane of Mannheim Road when he saw the guys who jumped him. [Defendant] states that he knew it was them and that he immediately recognized them.

13

[Defendant] states that the Latin Kings were in the nightclub parking lot and that there were at least seven Latin Kings in the lot near several cars along with other people. [Defendant] states that as he stood near the median in the northbound lane of Mannheim Road he fired the shotgun two times and squeezed the trigger two times at the Latin Kings in the parking lot.

[Defendant] states that he aimed the shotgun at the crowd of Latin Kings. [Defendant] states that after he fired the two shots he ran back in the direction he came from, eastbound through the parking lot along Division Street toward 40th street.

[Defendant] states that he threw the shotgun under some bushes as he ran away and then took off the black hoodie he was wearing and threw it on the ground as he ran."

¶ 36                                    I. Defendant's Wife

¶ 37        The State then rested its case. Defense counsel moved for a directed verdict, which was denied. The ASA observed that, of the State's exhibits, "the only one that won't go back to the jury is the map," and he then moved all of the State's exhibits into evidence. The trial court asked defense counsel if he had any objection, and he responded no. Back on the record, the State formally moved all its exhibits into evidence, and the trial court again asked defense counsel if he had any objection, and he again responded no. The exhibits were then received into evidence.

¶ 38        The defense's case consisted of two witnesses: (1) Guadalupe Vazquez, defendant's then-girlfriend and now wife, and (2) defendant.

14

¶ 39    Guadalupe Vazquez testified that on May 8, 2010, at 1 a.m., Vazquez, defendant, and their son were returning from "downtown" when they stopped at a liquor store in a strip mall on Mannheim Road. Defendant went into the liquor store and made a purchase. As they were exiting the strip mall in their vehicle, defendant asked Vazquez to stop the vehicle. He then exited the vehicle and began speaking to two Hispanic males. A van arrived and "eight to ten guys" attacked defendant. Vazquez shifted her vehicle to drive and "proceeded to act like [she] was going to hit them." The attackers then fled. Vazquez drove defendant, herself, and their son back to their apartment, making a short stop to purchase cigarettes. Once they had arrived at their apartment, Vazquez put their child in his crib and defendant cleaned himself. Defendant then left the apartment, appearing upset, but he did not express any anger toward the police.

¶ 40    On cross-examination, Vazquez testified that the liquor store where defendant purchased alcohol was in the same strip mall where the bar is located. Vazquez testified that the apartment she shared with defendant was eight blocks from the strip mall. She further testified that defendant did take his shotgun before exiting their apartment. Vazquez denied telling detectives in the morning of May 8, 2010, that she was unaware that defendant owned a gun. Vazquez also testified that there is a police station across the street from the strip mall but that she and defendant did not go to the police station to report the attack on defendant because her "instinct was to go home. That's where [she] felt safe."

¶ 41                                J. Defendant

¶ 42    Defendant testified that, on May 8, 2010, at 1 a.m., he, Vazquez, and their son were driving home from "downtown" when they stopped at a liquor store in a strip mall on Mannheim Road. Defendant went into the liquor store and then entered the vehicle with

15

Vazquez and their son, and Vazquez began to drive them to their apartment. As they were exiting the parking lot, defendant observed "a few Latino guys" flashing gang signs at their vehicle. Defendant asked Vazquez to stop the vehicle. Defendant then approached the individuals flashing gang signs because he wanted them to know that he and his family lived in the neighborhood and did not "want any problems." As defendant was talking to these men, more and more men began to gather around him. Then a van arrived; at least one person exited the van, and everyone around defendant began to beat him. There were at least eight or nine attackers. Vazquez shifted her vehicle into drive and the attackers "scattered." Once defendant, Vazquez, and their son arrived back at their apartment, defendant washed himself and took his shotgun. Defendant believed that the shotgun was a "close range weapon."

¶ 43    Defendant testified that he walked back to the strip mall and stood in the second lane of the northbound lanes of Mannheim Road, but he did not reach the median before firing both shots from his shotgun. Defendant testified that there were four lanes of traffic between where he fired his shotgun and the corner of the strip mall where defendant was pointing his shotgun. Defendant testified that he was shooting at the men who had previously attacked him, who were standing in the same area where they had attacked him. Defendant testified that he only intended to frighten these men, in retaliation for the fear they had created. Defendant did not observe any police officers or police vehicles in the parking lot. After firing the shotgun, defendant ran away and was subsequently apprehended. Defendant further testified that, as he was running away, but before he was apprehended, a vehicle with a number of Latin Kings drove past him and that the passengers of this vehicle attempted to shoot at him.

¶ 44   Defendant testified that he did give a statement to an ASA, but he did not say that he wanted to "shoot or hurt the Latin Kings in front of the nightclub." Defendant testified that he held "the gun from a longer distance because [he] knew it was a close range weapon, and [he] didn't really want to hurt nobody." Defendant did not realize that a police officer had been shot until defendant arrived at the police station. Defense counsel handed defendant a diagram of Mannheim Road. Defendant identified the location from which he had fired his shotgun at the Latin Kings and testified that, according to the diagram, this placed defendant 73 feet and 8 inches from the Latin Kings. This exhibit was later admitted into evidence without objection.

¶ 45   On cross-examination, defendant testified that he could not identify a specific distance from where the sawed-off shotgun could be shot at a target without being deadly. The State and defendant then engaged in the following exchange:

"THE STATE: Okay. But you know enough about this gun to know that it's a short range gun, is that correct?

DEFENDANT: Yes.

ASA: How short is short range?

DEFENDANT: Um, I know it's not for distance shooting.

ASA: When you say distance, how far are we talking?

DEFENDANT: I can't give you an exact—

ASA: Then how would you know where you were standing was a safe location to fire this gun?

DEFENDANT: I can't give you that answer.

ASA: So you didn't know, did you?

17

DEFENDANT: I know it's—I know it's not for 73 feet.

ASA: Where did you learn that?

DEFENDANT: I am not stupid.

ASA: Where did you learn it?

DEFENDANT: I never been in [*sic*] gun school, you know. I am sorry.

ASA: So where did you learn that 73 feet is a safe distance to fire this?

DEFENDANT: I never learned it.

ASA: You are guessing, aren't you? You just picked that number out of the air, didn't you?

DEFENDANT: No.

ASA: Well, then where did you learn it?

DEFENDANT: Where did I learn it? I was told by Mastrianni.[5]

* * *

ASA: And when Mr. Mastrianni told you that, you had been charged with this crime already, hadn't you?

DEFENDANT: Yes.

* * *

ASA: The night you fired that gun, May 8th of 2010, did you know 73 feet was a safe distance?

DEFENDANT: No, I did not.

---

[5]Before trial, the trial court barred the testimony of the defense's proposed expert witness Donald Mastrianni, a gun store owner who would have opined that defendant's sawed-off shotgun was not deadly at the distance from which it was fired.

ASA: And so when does this gun become dangerous?

DEFENDANT: It's a weapon. All guns are dangerous."

¶ 46        Defendant further testified that, when he fired his shotgun at the men who attacked him, there were seven or eight of his attackers standing at the corner of the strip mall. Defendant could not observe the faces of these men from where he was standing in the highway, but he knew that these were the men who attacked him because they were "standing in the same spot."

¶ 47                                K. State's Rebuttal

¶ 48        The defense then rested, and the State called Detective Pavini in rebuttal. Detective Pavini testified that on May 8, 2010, at 7:20 a.m., he interviewed Guadalupe Vazquez. During this interview, Vazquez stated that she had no knowledge of defendant owning a firearm. The State then rested in rebuttal.

¶ 49                          II. Conviction and Sentencing

¶ 50        On February 22, 2013, the jury returned a verdict of guilty against defendant for five counts of attempted first degree murder, one count of aggravated battery with a firearm, and one count of aggravated discharge of a firearm.

¶ 51        Specifically, with respect to Officer Vicari, the jury found defendant guilty of (1) attempted first degree murder of a peace officer, (2) attempted first degree murder by personally discharging a firearm that proximately caused permanent disfigurement, (3) attempted first degree murder by personally discharging a firearm that proximately caused great bodily harm, and (4) aggravated battery with a firearm of a peace officer performing his official duties. With respect to Officer Carr, the jury found defendant guilty of (1) attempted first degree murder of a peace officer, (2) attempted first degree murder by

personally discharging a firearm, and (3) aggravated discharge of a firearm in the direction of a peace officer performing his official duties.

¶ 52     On April 2, 2013, defendant argued his posttrial motion for a new trial, which was denied. In aggravation, the trial court heard defendant's criminal history for battery and domestic battery and that defendant was on probation for battery and aggravated driving under the influence at the time of the incident. The court found that the sentencing range of 20 to 80 years was sufficient to protect the public, so there was no need for an extended sentence or for consecutive sentences. After considering factors in aggravation and mitigation, the court sentenced defendant for 60 years with IDOC, stating:

> "THE COURT: Considering that the defendant was standing on a highway firing shots with a sawed-off shotgun at police officers, the Court would find that a minimum sentence is completely inappropriate in this case, and that for the protection of the public, a sentence of 60 years would be appropriate. The sentence in this case will be 60 years."

In the above-quoted pronouncement, the trial court did not specify what the sentences were for each offense, so defendant inquired:

> "DEFENDANT: And I had a question. You sentenced me to 60 years. Was that like for everything or was it—
>
> THE COURT: No, some of those sentences were for 30 years, but they all merge. They telescope in.
>
> The attempt murder to police officer, those sentences are 60 years.
>
> DEFENDANT: Yes.

THE COURT: Then you have agg bat [*sic*] to a police officer with a firearm, and that's a 30-year sentence.

And aggravated discharge to a police officer is also a 30-year sentence, but none of these are additional."

The trial court also observed that the sentence included three years of mandatory supervised release. Defendant's motion to reconsider sentence was denied, and a notice of appeal was timely filed.

¶ 53                                   III. Direct Appeal

¶ 54        On direct appeal, defendant claimed (1) that the trial court erred by barring the testimony of the defense's proposed expert witness, Donald Mastrianni, a gun store owner who would have opined that defendant's sawed-off shotgun was not deadly at the distance from which it was fired; (2) that defendant received ineffective assistance of counsel because his trial counsel failed to lay a proper foundation to introduce into evidence a supplementary investigation report from Detective Christopher Pavini, which defendant claims would have impeached the testimonies of Vicari and Carr; and (3) that the mittimus should be corrected to reflect only two counts of attempted first degree murder and that the counts of aggravated battery with a firearm and aggravated discharge of a firearm should be merged into the two counts of attempted first degree murder. As to the last point, the State agreed, and this court corrected the mittimus accordingly. However, we did not find defendant's other claims persuasive and affirmed his conviction and sentence. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶¶ 2-4.

¶ 55                              IV. Postconviction Proceedings

¶ 56            The sole issue that defendant raises in this appeal is whether his appellate counsel was ineffective for failing to raise a claim about his trial counsel's ineffectiveness with respect to certain photographs. As we observed above, the first step in analyzing such a claim is to consider whether the trial counsel was ineffective. *Supra* ¶ 3.

¶ 57            Defendant's *pro se* postconviction petition, filed on May 11, 2016, claimed, among other things, that his trial "counsel was ineffective when he failed to object to allowing the picture[s] of the blood splattered bullet proof vest and radio of Officer Vicari to be taken into the jury room during deliberations."

¶ 58            In his *pro se* petition, defendant argued that "the medical reports, photographs taken of Vicari at the hospital and the testimony of the witnesses adequately supplied any facts the [S]tate intended to prove by display of the vest and radio" and, thus, "the viewing of the vest and radio had no probative value, and it could only excite the jury's emotions concerning the shooting of a police officer." In support, defendant cited *People v. Burrell*, 228 Ill. App. 3d 133 (1992), in his petition. In *Burrell*, the defendant had argued that "he was denied a fair trial when, over defense objection, the police officers' bullet-marked and blood-stained uniforms were sent to the jury room during deliberations." *Burrell*, 228 Ill. App. 3d at 143-44. This court found that, although "the police officers' clothes were probative to the issues of intent to kill the officers and great bodily harm," the prejudicial effect outweighed the probative value of these items. *Burrell*, 228 Ill. App. 3d at 144. However, the error was "harmless because the evidence of defendant's guilt was overwhelming." *Burrell*, 228 Ill. App. 3d at 144.

¶ 59    In open court, on July 15, 2016, the trial court stated that it had reviewed the entire petition and all its claims. Finding that the evidence against defendant was overwhelming, the trial court observed that "defendant testified that he in fact fired a shotgun into a group of people while he was standing on the street." In light of the overwhelming evidence of defendant's guilt, the trial court found the petition frivolous and patently without merit. The trial court then directed the court reporter to type the transcript of its ruling and directed the clerk to send it to defendant. Defendant filed a *pro se* notice of appeal, dated August 3, 2016, and this court permitted appellate counsel to file an amended notice of appeal on May 29, 2018. This appeal followed.

¶ 60    We observe that the photographic exhibits at issue are not part of the appellate record before us. On appeal, defendant's counsel sought an order from this court directing the circuit court clerk to prepare and release exhibits, which we granted on May 29, 2018. In defendant's brief to this court, filed on August 9, 2018, defendant's counsel observed that, to date, he had not yet received a response but that the photos were clearly identified and described in Officer Vicari's own testimony. On September 18, 2018, defense counsel sought and obtained an order from this court to supplement the record with the "Impounding Order," dated October 22, 2014, from the circuit court, which listed the trial exhibits in this case that had been impounded. The photos were not on the list.

¶ 61                                    ANALYSIS

¶ 62    For the following reasons, we cannot find that the trial court erred by dismissing defendant's *pro se* postconviction petition at the first stage as frivolous and patently without merit.

¶ 63                          I. Stages of Postconviction Proceedings

¶ 64          The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018))

provides a statutory remedy for criminal defendants who claim that their constitutional rights

were violated. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not intended to be a

substitute for a direct appeal; instead, it is a collateral proceeding, which attacks a final

judgment. *Edwards*, 2012 IL 111711, ¶ 21.

¶ 65          The Act provides for three stages of review by the trial court. *People v. Domagala*,

2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition that

is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *Domagala*,

2013 IL 113688, ¶ 32. "[A] petition is frivolous or patently without merit only if it has no

'arguable basis either in law or in fact.' " *Petrenko*, 237 Ill. 2d at 496 (quoting *People v.

Hodges*, 234 Ill. 2d 1, 16 (2009)).

¶ 66          If a trial court does not dismiss a petition at the first stage, the petition then advances

to the second stage, where counsel is appointed if a defendant is indigent. 725 ILCS 5/122-4

(West 2018); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend

the petition, the State may file either a motion to dismiss or file an answer to the petition. 725

ILCS 5/122-5 (West 2018); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial

court must determine "whether the petition and any accompanying documentation make a

substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246

(2001).

¶ 67          If the defendant makes a "substantial showing" at the second stage, then the petition

advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-

stage evidentiary hearing, the trial court acts as a factfinder in determining witness

credibility, the weight to be given particular testimony and evidence, and any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 68     When a matter is decided without an evidentiary hearing, as it was in this case, we review the trial court's decision under a *de novo* standard of review. See *People v. Hommerson*, 2014 IL 115638, ¶ 6 (first-stage summary dismissal); *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151 (second-stage dismissal, citing *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)). Under a *de novo* standard, the reviewing court owes no deference to the trial court's judgment or reasoning. *Tyler*, 2015 IL App (1st) 123470, ¶ 151. *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Tyler*, 2015 IL App (1st) 123470, ¶ 151.

¶ 69     In addition, a reviewing court may affirm on any basis found in the record. *In re Gabriel*, 2017 IL App (1st) 172120, ¶ 31; *People v. Miles*, 2017 IL App (1st) 132719, ¶ 22; *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37 ("we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct").

¶ 70                          II. Ineffective Assistance of Counsel

¶ 71     In the present appeal, defendant asserts two layers of ineffective assistance of counsel. First, he asserts that counsel on his direct appeal was ineffective for failing to assert the ineffective assistance of his trial counsel. However, counsel on his direct appeal did, in fact, assert the ineffective assistance of defendant's trial counsel, although not on the specific ground that defendant raises now. In his postconviction petition and in this appeal from the dismissal of his postconviction petition, defendant *now* claims that his trial counsel was *additionally* ineffective for failing to object to the publication in the jury room of photographs of a bloody police vest and radio.

¶ 72       As a preliminary matter, the State claims that defendant forfeited his claim of ineffective assistance of appellate counsel because his postconviction petition failed to allege that appellate counsel was ineffective. The State argues that "nowhere in his petition did he allege that appellate counsel was constitutionally deficient." This is incorrect. In his petition, defendant raised a number of claims concerning trial counsel, including the one he raises now about the photographs, and then concluded with: "For the reasons stated above we feel there is sufficient evidence to claim ineffective assistance of trial counsel, and ineffective assistance of appellate counsel for not raising these issues on appeal."

¶ 73       Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and article I, section 8, of the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Domagala*, 2013 IL 113688, ¶ 36.

¶ 74       The Illinois Supreme Court has found that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland* for Illinois)); *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (also citing *Albanese*). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694); *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (also citing *Strickland*).

26

¶ 75        "At the first stage of proceedings under the Act, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (i) *it is arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) *it is arguable* that the defendant was prejudiced." (Emphases added.) *Petrenko*, 237 Ill. 2d at 497 (citing *Hodges*, 234 Ill. 2d at 17).

¶ 76        "The *Strickland* standard applies equally" to claims concerning trial and appellate counsel. *Petrenko*, 237 Ill. 2d at 497. A defendant raising a claim concerning appellate counsel "must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *Petrenko*, 237 Ill. 2d at 497. If a postconviction petition claims that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness, a reviewing court must first consider whether the claim of trial counsel's ineffectiveness would have succeeded on direct appeal. *Petrenko*, 237 Ill. 2d at 501-52. If the underlying claim would not have succeeded on direct appeal, then "there is no arguable legal basis" for defendant's claim of ineffective assistance of appellate counsel, and "summary dismissal of his *pro se* postconviction [petition]" is "proper." *Petrenko*, 237 Ill. 2d at 501-02.

¶ 77        To prevail, a defendant must satisfy *both* prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *Graham*, 206 Ill. 2d at 476.

¶ 78                                    III. No Prejudice

¶ 79            Under the second prong, a postconviction petition must show at the first stage that, but for counsel's deficient performance, it is arguable that there is a reasonable probability that the result of the proceeding would have been different. *Petrenko*, 237 Ill. 2d at 497; see also *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694); *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. "In other words, the defendant was prejudiced by his attorney's performance." *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011).

¶ 80            Defendant argues that his trial counsel was ineffective for failing to object to the publication in the jury room of the photographs of Vicari's bloody police vest and radio. During trial, the ASA observed that, of the State's exhibits, "the only one that won't go back to the jury is the map," and he then moved all of the State's exhibits into evidence. The trial court asked defense counsel if he had any objection, and he responded no. Thus, defendant's trial counsel did not object to the ASA's assertion that all the State's exhibits, including the photographs, would "go back to the jury," except for a map.

¶ 81            However, we need not determine if trial counsel was ineffective in failing to object to the publication in the jury room of the photographs. See *Graham*, 206 Ill. 2d at 476. The overwhelming evidence of defendant's guilt in this case precludes defendant from being capable of showing that there was a reasonable probability that the outcome of the case would have been different if the photographs had not been published in the jury room. See

*People v. Clay*, 379 Ill. App. 3d 470, 480 (2008); *People v. Williams*, 368 Ill. App. 3d 616, 622 (2006).

¶ 82    In the case at bar, defendant testified at trial that he stood in the middle of a street and deliberately fired a shotgun toward several people. There is no dispute that these people were, in fact police officers and that he hit one, causing lasting and permanent damage. There are no claims of accident or self-defense.

¶ 83    Although defendant admitted to being the shooter, he testified that he did not observe any police officers or police vehicles in the area. However, the State presented overwhelming evidence that the targets of the shooting were obviously police officers to even a casual observer. Contrary to defendant's testimony, Officer Vicari testified that he and his partner were wearing bulletproof vests with the word "Police" on the back, that the parking lot was well-lit and that he was in the process of handcuffing and patting down a suspect, which is typically done only by a police officer. Similarly, Officer Carr testified that both officers were wearing bulletproof vests with the word "Police" written on the back, that their badges were on the front of their vests, and that their police duty belts, holding their equipment, were around their waists. Officer Morales also testified that Officers Vicari and Carr were wearing their bulletproof vests, with their police badges showing, as well as their police belts with their firearms and other equipment; that they were in the process of handcuffing another person; and that they were the only people present in the strip mall parking lot. In addition to the testimony of multiple officers, there were also the corroborating photographs of Officer Vicari's bloody vest, which are the subject of this appeal and which establish that he was indeed wearing his police vest at the time of the shooting.

¶ 84     In addition to the facts that the officers were wearing vests stating "Police" with badges and guns and engaging in the uniquely police function of handcuffing and patting down a suspect, both Sergeant Jenkins and Officer Morales also testified to the presence of a marked squad vehicle. Sergeant Jenkins testified that he observed the shooter pointing the shotgun at "one marked police car, which was behind another unmarked car." Sergeant Jenkins explained that "there were a couple of police officers and what appeared to be a citizen or someone that they had in custody *near the back side of a marked vehicle*." (Emphasis added.) He did not observe any other individuals in the strip mall parking lot. Officer Morales, who was also on the scene, explained that, although Officer Vicari's vehicle was unmarked, his vehicle was a marked police vehicle.

¶ 85     Defendant's admission at trial that he was the shooter, plus the State's evidence of officers with bulletproof vests stating "Police," engaging in the uniquely police function of patting down and arresting a suspect, while standing next to a marked police vehicle in a well-lit and otherwise isolated parking lot, overwhelmingly established that defendant knowingly shot at police officers engaged in their duties.

¶ 86     Because the undisputed evidence of defendant's guilt is overwhelming, we need not determine if trial counsel's performance was deficient in failing to object to the publication of the photographs in the jury room. See *Graham*, 206 Ill. 2d at 476.

¶ 87                                IV. No Deficient Performance

¶ 88     Even if we could find prejudice—which we cannot—we still could not find that trial counsel rendered constitutionally defective assistance by failing to object to the publication of the photographs in the jury room.

¶ 89    Under the first prong of the *Strickland* test, a postconviction petition must show that it is arguable that counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36; *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220; see also *Petrenko*, 237 Ill. 2d at 497 ("it is arguable").

¶ 90    First, in the case at bar, the police officer shot did not die. He was alive and testifying about his injuries, in front of the jury. Thus the photographs did not raise the specter of dead police officers, who could not speak on their own behalf. *People v. Blue*, 189 Ill. 2d 99, 125-26 (2000) (finding prejudice in the display of a life-size headless mannequin wearing the blood-and-brain-spattered uniform of a dead police officer).

¶ 91    Second, the photographs were not gruesome. They were photographs of a vest and a radio with blood on them, not photographs of injured people or bodies. These were inanimate objects.

¶ 92    Third, these exhibits were not the actual "bullet-marked and blood-stained" garments themselves as in *Burrell*, 228 Ill. App. 3d at 143-44, but photographs. See *Blue*, 189 Ill. 2d at 125-26 ("the physical evidence here was not photos ***, but the actual remnants ***, spattered with the actual blood and brains of the victim"); see also *Blue*, 189 Ill. 2d at 122 (drawing an analytical distinction between cases involving "photographic evidence" and those involving "the admission of articles of clothing worn by a victim").

¶ 93    Fourth, defendant asserted in his trial testimony that he did not know that the people he was shooting at were police officers. The photographs established that the police officers were carrying police vests and radios when defendant was shooting at them, thereby impeaching his testimony. As this court found in *Burrell*, "the police officers' clothes were probative to the issues of intent to kill the officers." *Burrell*, 228 Ill. App. 3d at 144; see also

*Blue*, 189 Ill. 2d at 125 (the dead police officer's uniform was "nominally probative of a material fact," namely, the placement and nature of the fatal wounds).

¶ 94 Fifth, as we found in *Burrell*, any undue prejudice was rendered "harmless because the evidence of defendant's guilt was overwhelming." *Burrell*, 228 Ill. App. 3d at 144.

¶ 95 As a result, we cannot find that trial counsel rendered constitutionally defective assistance by not objecting to the photographs, where the trial court was unlikely to sustain the objection.

¶ 96 CONCLUSION

¶ 97 Since we cannot find an arguable basis for either prejudice or deficient performance, we affirm the trial court's first-stage summary dismissal of defendant's *pro se* postconviction petition.

¶ 98 Affirmed.

**No. 1-16-2259**

| | |
|---|---|
| **Cite as:** | *People v. Carlisle*, 2019 IL App (1st) 162259 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-10481; the Hon. Gregory Robert Ginex, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |