2022 IL App (1st) 190947-U

THIRD DIVISION
March 23, 2022

No. 1-19-0947

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 507 (01) |
| | ) | |
| CESAR RUIZ, | ) | Honorable |
| | ) | Stanley J, Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Affirmed. Dismissal of first-stage conviction petition alleging ineffective assistance of trial and appellate counsel was proper, as defendant was not arguably prejudiced by counsel's failures to (1) offer codefendant's statement admitting her involvement in murder into evidence, or (2) object to testimony about defendant's alleged treatment of codefendant.

¶ 2     Separate juries convicted defendant Cesar Ruiz and his codefendant Crystal Valdez of first-degree murder for their respective roles in the fatal beating of Christopher Valdez, Crystal's 4-year-old-son. At issue in this appeal are two post-conviction claims of ineffective assistance of counsel raised by defendant and dismissed by the circuit court at the first stage. We conclude that

defendant cannot show arguable prejudice on either claim and affirm the summary dismissal of his petition on this basis.

¶ 3                                    BACKGROUND

¶ 4    We begin with a brief overview of Christopher's murder and the trial evidence to provide the necessary context and background for our discussion. We will elaborate on particular factual issues as they become relevant to our analysis of the limited issues before us. For a full statement of the facts, see our decision affirming defendant's conviction on direct appeal. *People v. Ruiz*, 2018 IL App (1st) 152458-U, ¶¶ 4-41.

¶ 5                              I. Christopher's murder

¶ 6    At the time of the murder, Christopher and his 5-year-old sister, Christine, lived with Crystal in a small coach house on the property of Fernando Ruiz and Marilu Romo. Defendant lived with them, having moved in a few months earlier, within days of starting to date Crystal.

¶ 7    In those few months leading up to Christopher's death, Crystal's relationship with her family—including her parents, who lived across the alley, and her brother Joe and his wife Katrine, with whom she had previously been close—began to fray. Testimony from Katrine and Joe pointed to a mix of factors, including the family's dislike of defendant, what they perceived as his controlling behavior and attempts to isolate Crystal from her family, and evidence that Christopher was being physically abused. On that last front, suspicions appeared to be trained on Crystal more than on defendant.

¶ 8    Christopher was murdered sometime on the night of November 24, 2011 (Thanksgiving), or early in the day on November 25, 2011 (his fourth birthday). Or more precisely, that is when the final "insult," in the medical examiner's phrase, took place. At Thanksgiving dinner with Fernando and Marilu—when Christopher was last seen alive—he already showed signs of

significant physical abuse. The left side of his face was bruised. He had bruises all over his back and chest, which Crystal showed to Marilu when defendant stepped out for a moment to retrieve some items for the meal. Christopher was withdrawn and unable to eat, although he did perk up momentarily when defendant stepped out. And he vomited, at which point defendant took him back to the coach house for the remainder of the evening. Crystal and Christine stayed with Fernando and Marilu for a little while before presumably returning to the coach house.

¶ 9 Christopher's body was found around 2 p.m. the next day, when Joe and Katrine went to check on him. (Marilu had called to express concern.) Crystal and defendant were both fully dressed, though they stretched and yawned, as if feigning to have been asleep. The house, which was normally neat, was in disarray; the closets had been emptied and everyone's clothes were packed into totes that were stacked up in the kitchen.

¶ 10 Crystal first tried to prevent Joe and Katrine from coming inside, and then from entering the bedroom. But they persisted and pushed their way past her. Katrine found Christopher's body wrapped in a blanket on the bed. He was non-responsive and covered in bruises.

¶ 11 Joe punched Crystal in the face. Katrine asked, "What did you do?" Crystal answered, "It was him" (according to Joe) or "He did it" (according to Katrine). Defendant replied, "And so did you," to which Crystal, in turn, said, "No it was you." Defendant then said, "You helped me" and "She hit him first." Joe pushed defendant into the wall and punched and choked him until Katrine intervened. As Joe hit him, defendant said he was sorry and claimed it was an accident. When Joe eventually relented, he called 911.

¶ 12 The paramedics noted that rigor mortis and lividity had set into Christopher's body, indicating that he had been dead for at least two hours and probably longer than that. Many of his

bruises were covered with what appeared to be a flesh-toned makeup. Katrine found two bottles of cover-up makeup in the bedroom, which she gave to the police.

¶ 13    Defendant and Crystal were arrested at the scene and separately interrogated later that day. A video and transcript of defendant's custodial interrogation were admitted into evidence and published to the jury. The details of defendant's statement will concern us later. Suffice it to say, by way of summary, that little by little, over the course of the interrogation, defendant admitted to striking Christopher in various ways that would turn out to be consistent with the medical examiner's findings regarding Christopher's extensive, and collectively fatal, injuries.

¶ 14    This beating took place, he said, after Crystal came back to the coach house after Thanksgiving dinner and "bl[ew] up" at defendant and the kids. Crystal was prone to screaming and arguing with all of them. More importantly, he said, she was prone to beating Christopher and had done so in recent days. That night, amid this ongoing strife, defendant "finally *** lost it" and, in his rage, joined in Christopher's abuse.

¶ 15    In short, defendant's custodial statement implicated both defendant and Crystal in the physical abuse that caused Christopher's death. Taking the stand in his own defense, however, defendant walked back most of his admissions. See *id.* ¶¶ 33-38. He testified on direct that all he did to Christopher on the night in question was spank or swat him on his bottom, when he was difficult about going to bed. (On cross-examination, defendant acknowledged that he also pulled Christopher's hair and yanked his arm.) When he told the detectives that he "lost it," defendant testified, he was referring to punching and breaking the wall—so as not to take his anger out on anyone in the house.

¶ 16    Dr. Laura Moser-Woertz, an assistant medical examiner, performed a post-mortem exam of Christopher's body on November 26, 2011 (the day after defendant's interrogation) and

testified about his extensive internal and external injuries. See *id.* ¶¶ 28-31. In her opinion, all of Christopher's injuries—attributed by defendant, in his custodial statement, to a mix of his own conduct and Crystal's—contributed to Christopher's death.

¶ 17                                II. Verdict, appeal, and post-conviction petition

¶ 18    Defendant's jury was instructed on first-degree murder, based on both intentional and strong-probability murder. See 720 ILCS 5/9-1(a)(1)-(2) (West 2012). The State's theory, as presented in closing argument, was that defendant and Crystal both contributed to Christopher's fatal injuries and were thus both guilty of his murder. To this end, the jury was instructed that to find defendant guilty, it only had to find that his "acts were a contributing cause of [Christopher's] death" but not necessarily "the sole and immediate cause of [his] death." Illinois Pattern Jury Instruction, Criminal (4th) No. 7.15. The jury was also instructed on accountability, and the State argued that defendant was guilty either as a principal or because he was accountable for Crystal's acts of violence against Christopher. The jury returned a general verdict of guilty on one count of first-degree murder. (A separate jury later returned a general verdict of guilty against Crystal.)

¶ 19    We affirmed defendant's conviction on direct appeal. While we agreed that the admission of Crystal's custodial statements accusing defendant of killing Christopher violated his sixth-amendment right of confrontation, we found that the error did not require reversal: Crystal's statements played at most a minimal role in the State's case, largely because defendant confessed that he and Crystal both beat Christopher. *Ruiz*, 2018 IL App (1st) 152458-U, ¶¶ 81-83.

¶ 20    Defendant filed a timely post-conviction petition, which the circuit court dismissed at the first stage. Among other claims no longer at issue, defendant alleged ineffective assistance on two grounds. First, trial counsel should have introduced the recording of Joe's 911 call, in which

Crystal can be heard in the background exclaiming, "I killed him, my Christopher." Second, trial counsel should have objected to the admission of irrelevant testimony about Crystal's isolation from her family after meeting defendant. Defendant also alleged that direct-appeal counsel was ineffective for failing to raise this second issue.

¶ 21     As to both ineffectiveness claims, the circuit court found that defendant could not show arguable prejudice, because the evidence of his guilt was overwhelming.

¶ 22     The circuit court also found that an objection to the testimony about Crystal's isolation from her family would have been futile, because the testimony was relevant for at least two purposes: (1) to rebut defendant's theory that Crystal was the only abusive person in the home and was solely responsible for Christopher's death and (2) to show that Crystal would have been motivated to cover for defendant because "she was afraid and/or being controlled by" him.

¶ 23                                    ANALYSIS

¶ 24     At the first stage of post-conviction proceedings, a petition alleging ineffective assistance need only establish *arguable* deficiency and prejudice. *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010); see *Strickland v. Washington*, 466 U.S. 668 (1984). This standard applies to claims of ineffective assistance of trial and appellate counsel. *Petrenko*, 237 Ill. 2d at 497. Prejudice means a "reasonable probability" that the result of the proceeding would have been different, if not for counsel's error(s), and a "reasonable probability" is one "sufficient to undermine confidence in the outcome." *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 79. A petition that fails to show arguable prejudice may be summarily dismissed on that basis alone. *Id.* ¶ 77. We review the summary dismissal of a petition *de novo*, giving no deference to the trial court's ruling. *Id.* ¶ 68.

¶ 25                              I. Crystal's statement

¶ 26     Crystal's brother Joe Valdez called 911 upon discovering Christopher's dead body. The

call was recorded, and in the background, Crystal can be heard exclaiming, "I killed him, my Christopher." The recording was disclosed to the defense in discovery, but counsel did not use it at trial. Defendant contends that counsel was arguably ineffective for failing to do so, because the recording of Crystal's spontaneous admission supported the defense theory that Crystal alone was responsible for Christopher's death.

¶ 27    Whether counsel's failure to offer this evidence was arguably deficient, it did not arguably prejudice defendant. Crystal's statement—at best, if taken literally—would have provided further evidence of her role in beating Christopher to death. But it would not have rebutted defendant's own admitted role in the offense.

¶ 28    To begin, the State's theory, as set forth in its opening statement and closing argument, was joint contributing causation: defendant and Crystal *both* struck Christopher and contributed to the injuries that caused his death. Consistent with this theory, the jury was instructed that it could find defendant guilty if his "acts were a contributing cause of [Christopher's] death," even if they were not "the sole and immediate cause of [his] death." IPI Criminal (4th) No. 7.15. As the State thus argued, it did not "have to prove who gave that final blow to end that little boy's life." It was enough to prove that Christopher died as the result of "the beating that [defendant] and Crystal gave him ***."

¶ 29    To whatever extent Crystal may have admitted *her* role in the beating, defendant, for his own part, surely admitted *his*. Granted, defendant sought to downplay the force of his blows and to minimize the extent of his involvement, but over the course of his interrogation, he admitted, little by little, to a series of strikes in precisely the areas where the medical examiner would later find notable injuries on Christopher. As we explained on direct appeal, "[t]his was the heart of the State's case against defendant as a principal—the correspondence between his own

admissions and the evidence of Christopher's injuries that was later garnered during his post-mortem exam." *Ruiz*, 2018 IL App (1st) 152458-U, ¶ 81.

¶ 30    For example, there were "defects" on Christopher's buttocks, where defendant admitting hitting him. Christopher suffered significant bruising to his right side, consistent with being forcefully grabbed and struck; defendant admitted grabbing Christopher in that area and hitting him with a blow that, by his own description, "wasn't a soft tap." Christopher had a distinctive pattern of bruises overlaying his ribcage, consistent with being slammed against a wall; and there was a hole in the drywall in the bedroom, the site of defendant's beating of Christopher, where a broken mirror, found discarded in the alley (by Katrine and again by the police), once hung. Christopher sustained damage to multiple organs and had significant internal bleeding; defendant reluctantly acknowledged that he "may have" hit Christopher in the stomach. Christopher's right arm was bruised where defendant admittedly grabbed him, and his scalp was bruised where defendant admittedly pulled his hair. *Id.* ¶¶ 21, 29, 81.

¶ 31    We acknowledge that defendant tried to walk back these admissions in his testimony. See *id.* ¶¶ 33-38. But the striking correspondence between his admissions and the medical examiner's findings made it all but impossible for him to do so. He had squarely admitted to causing many of Christopher's injuries, and in the medical examiner's opinion, all of those injuries contributed to Christopher's death. Thus, defendant effectively confessed to Christopher's murder. The case for principal liability, on a theory of contributing causation, was open and shut.

¶ 32    Would Crystal's spontaneous statement, "I killed him, my Christopher," arguably lead to a different outcome, when that statement is considered alongside defendant's own confession, as well as the theories, arguments, and evidence as a whole presented at trial? Our answer is no.

¶ 33    There was no dispute at trial that Crystal (who, again, was tried separately) participated in

the abuse that killed Christopher. That premise was essential to the State's theory of contributing causation—and to its alternative theory that defendant was accountable for Crystal's acts of violence against Christopher. It was a fact, in other words, which the State admitted, and one on which the State and defendant thus agreed. To the extent that Crystal's statement confirmed her participation in Christopher's abuse, it did not speak to any factual dispute at trial, and so it would not have resolved any such dispute in defendant's favor.

¶ 34    And even without Crystal's statement, the jury heard evidence that she beat Christopher. That was not only part of the State's theory—it was also part of defendant's own account of events, from the very first time he was confronted about Christopher's death. Fuming over the discovery of his dead nephew, Joe initially confronted Crystal, who in turn accused defendant of beating Christopher. Defendant replied: "And so did you," "You helped me," and "She hit him first." Note that defendant neither took all the blame nor put it all on Crystal. Rather, he immediately acknowledged that *both* of them beat Christopher.

¶ 35    That same acknowledgement framed defendant's custodial statement. Early on, he told the detective that the "butt whooping" had "just started getting out of control again." By this, he meant that Crystal had a history of abusing Christopher (including a recent "domestic case"), and that she had started beating him again in the days leading up to his death. And after defendant confessed to his own role in Christopher's final beating on Thanksgiving night (when he "finally *** lost it," purportedly in the face of Crystal's incessant screaming and abusive behavior), he reiterated, "I'm telling you man I'm not the only one that—." To which the detective replied, "no one's saying you're the only one." Of course, this was defendant, not Crystal, implicating Crystal in the beating(s). But again, her physical abuse of Christopher and contribution to his death was never in dispute; the State conceded all of this from the very start of the trial.

9

¶ 36    In short, the evidence, arguments, and theories presented at trial were all uniformly based on the premise that Crystal was physically abusing Christopher around the time of his death and thus was one of two contributing causes of his death. So the State only needed to prove that defendant's conduct was another, contributing cause of his death. For this reason, defendant cannot establish that he was even arguably prejudiced by his attorney's failure to introduce an admission from Crystal that she "killed" Christopher, even if one were to accept that admission literally. Crystal's statement may appear highly exculpatory for defendant when stripped of its context; but with that necessary context, it is plainly not a denial that defendant *also* beat Christopher, as he confessed to doing.

¶ 37    Given defendant's confession, the medical examiner's findings, the close correlation between the two, and the theory of joint contributing causation that was based on this evidence, we find no reason to believe that Crystal's statement might have changed the jury's conclusion that defendant, by his own admission, was *one* of the contributing causes of Christopher's death. Defendant has failed to show arguable prejudice, and his claim of ineffective assistance was properly dismissed on this basis. See *Carlisle*, 2019 IL App (1st) 162259, ¶ 77.

¶ 38                    II. Testimony about Crystal's family relations

¶ 39    The State elicited testimony that, after Crystal started dating defendant, her relationship with her family soured. She became timid and withdrawn; she stopped attending family events, such as Christine's birthday party and the family's Thanksgiving dinner; and in general, she spent less time with her family than she used to.

¶ 40    Defendant contends that this evidence had no relevant purpose and was elicited by the State simply to paint him as "controlling" and "abusive" toward Crystal. (To be clear, no witness testified to any alleged act of domestic violence committed by defendant against Crystal. That

evidence would, of course, be relevant and presumptively admissible under section 115-7.4 of the Code of Criminal Procedure. See 735 ILCS 5/115-7.4 (West 2019)).

¶ 41     Thus, defendant argues, trial counsel was arguably ineffective for failing to object to this testimony on relevance grounds—or, in the alternative, on grounds of undue prejudice. And appellate counsel was arguably ineffective for failing to raise this issue (based as it was on the trial record) on direct appeal.

¶ 42     The circuit court properly dismissed this claim as well. Even if the jury heard irrelevant or needlessly unflattering evidence suggesting that defendant tried to isolate Crystal from her family, the fact remains that defendant confessed to beating Christopher on Thanksgiving, his admitted strikes closely correlated with the injuries found by the medical examiner, and those injuries were a contributing cause of death. It is not even arguable that the jury might have acquitted defendant, his corroborated confession notwithstanding, if only it hadn't heard evidence of Crystal's deteriorating family relations right around the time defendant entered the picture. Defendant has failed to show arguable prejudice.

¶ 43                                    CONCLUSION

¶ 44     For these reasons, we affirm the dismissal of defendant's post-conviction petition.

¶ 45     Affirmed.