2020 IL App (1st) 170005-U

No. 1-17-0005

Order filed April 9, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 19922 |
| | ) | |
| ANTHONY ADAMS, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justice Reyes concurred in the judgment.
Presiding Justice Gordon specially concurred.

**ORDER**

¶ 1    *Held*:  We affirm the summary dismissal of defendant's *pro se* postconviction petition, as well as the denial of his motion to reconsider the denial of the petition, where defendant failed to present an arguable claim of ineffective assistance of trial counsel.

¶ 2    Defendant Anthony Adams appeals from the trial court's summary dismissal of his *pro se*

petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2016)), as well as the denial of his motion to reconsider the dismissal. On appeal, defendant

contends the that trial court erred in dismissing his petition because he presented an arguable claim that his trial counsel was ineffective for failing to call a witness. For the following reasons, we affirm.[1]

¶ 3    Following a 2013 bench trial, defendant was convicted of the first-degree murder of his girlfriend, Clara Bryant, and sentenced to 36 years' imprisonment. We affirmed on direct appeal. *People v. Adams*, 2015 IL App (1st) 132364-U. Because we set forth the facts on direct appeal, we recount them here to the extent necessary to resolve the issue raised on appeal.

¶ 4    At trial, it was undisputed that defendant severely beat Bryant on Saturday, May 22, 2010, and that she died four days later. Bobbie Lloyd, Bryant's mother, testified that Bryant and defendant were in a relationship for about 20 years and lived together in an apartment. On the Friday before her death, Bryant borrowed Lloyd's car. The next day, Saturday, Lloyd spoke with Bryant by telephone. On Sunday, Lloyd made several unsuccessful attempts to call Bryant. On Monday morning, defendant returned Lloyd's car, telling Lloyd that Bryant was not going to work that day. On Monday afternoon, Lloyd reached Bryant by telephone. At that time, Bryant told Lloyd that she and defendant had gotten into a fight on Saturday night.

¶ 5    On Tuesday, May 25, defendant telephoned Lloyd and asked her to bring "Bengay, Epsom Salts and pain pills" to the apartment he shared with Bryant. Lloyd brought those items, including a prescription painkiller, Tramadol, that was prescribed to Lloyd. Lloyd gave the items to defendant outside the apartment, but she did not go inside the apartment.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 6     On the evening of Wednesday, May 26, defendant called Lloyd and told her that Bryant was "not responding." Lloyd went to the apartment, where she saw several members of defendant's family. Lloyd went to the bedroom and saw that Bryant was deceased; her face was "bruised and battered." Defendant was crying and repeatedly told Lloyd that he was "sorry" and also said "I'm dead."

¶ 7     Traci Adams, defendant's sister, testified that on Wednesday, May 26, around 4:30 or 5 p.m., defendant called her and told her that Bryant was "not responding" and "listless." Defendant told Adams that he and Bryant had gotten into a fight on Saturday. Adams came to the apartment and saw Bryant "laying on the floor" in the bedroom. Defendant told Adams that he had been "putting [Bryant] in and out of the tub all day and she asked me to just let her lay there on the floor." Adams knelt by Bryant, who did not speak but "just moaned."

¶ 8     Adams told defendant that Bryant needed to go to a doctor, but defendant responded that he was concerned about getting in trouble. Adams and defendant moved Bryant to a bed. Adams told defendant to call the paramedics, but defendant responded that Bryant's mother had "brought some medication over and Ben Gay, she will be okay." Before leaving, Adams asked defendant to call her when Bryant woke up. About 10:30 or 11 p.m., defendant called Adams and told her that Bryant was dead. Adams went to defendant's apartment and saw that defendant appeared to be distraught. The next morning, defendant told Adams that he should have called the paramedics and that he never should have hit Bryant.

¶ 9     The parties stipulated that one of Bryant's coworkers, Lavonne Banks, would testify that Bryant called her on Monday, May 24, and said that she was not feeling well and needed the day

off. The following day, Bryant called an office administrator and requested the day off. Bryant did not call in to the office on Wednesday.

¶ 10    Police officer Babette Murray testified that about 11:45 p.m. on May 26, she was dispatched to defendant's apartment. In the bedroom, she saw that Bryant was deceased and had bruises. Murray spoke to defendant, who told her that Bryant had been "lethargic, in and out of consciousness" and that he tried to care for her by giving her medicine. Defendant told Murray that Bryant's bruises were from a physical altercation he and Bryant had on the previous Saturday.

¶ 11    Detective Don McGrath testified that he arrived at the apartment at 1:45 a.m. on May 27. He observed Bryant's body and saw that she had bilateral contusions to the face, her neck was swollen, and she had subcutaneous hemorrhaging on her upper chest. McGrath conducted a field interview with defendant. Defendant told McGrath that on May 22, he and Bryant got into an argument that escalated into a physical altercation, and he admitted to striking Bryant.

¶ 12    Anthony Selmon and Vivian Travis testified about prior incidents of uncharged domestic violence involving defendant that occurred in 1997, 1998, and 2001. Vivian Travis testified that during the 1997 incident, defendant hit Bryant and also put his hand around Bryant's throat in a chokehold.

¶ 13    Joseph Cogan, M.D., a forensic pathologist, conducted an autopsy on Bryant. Cogan testified that toxicology reports indicated that Tramadol was administered to Bryant a few hours before death. Cogan's external examination revealed multiple blunt force injuries to Bryant's head, neck, upper chest and upper arms. Bryant had "bilateral black eyes" consistent with being punched, and her neck injuries were consistent with a chokehold. Petechial hemorrhaging in the eyes was consistent with strangulation or neck compression. Bryant had a number of contusions in the

abdomen and lower ribs, and she suffered a rib fracture. Cogan observed discoloration and pooling of blood, which was consistent with the body laying immobile for a period of time. Bryant also suffered injuries "in the axillar area" that were consistent with someone attempting to lift or move the body.

¶ 14   Cogan's internal examination revealed a fracture of the cervical spine. He testified that it looked "as if th[e] head and neck were just literally torn off of the thoracic spine." He opined that the fracture was consistent with a "V-shaped choke-hold." The neck fracture would have caused Bryant to be paralyzed from the shoulders down but able to speak. Cogan explained that the injuries were consistent with having been inflicted several days prior to death. Cogan testified that blood loss from various blows "would be a factor which could be lethal by itself" but that the cervical spine fracture was "not immediately lethal." Cogan opined that, within a reasonable degree of scientific certainty, Bryant "died as a consequence of multiple blunt force injuries, and that was due to an assault."

¶ 15   The defense introduced a stipulation regarding an investigator's interview with Vivian Travis, during which Travis described the 1997 domestic violence incident but did not mention defendant choking Bryant. The defense rested after that stipulation.

¶ 16   During closing argument, defense counsel argued that Bryant's neck fracture could have been caused sometime after the initial altercation on Saturday night. Counsel suggested the fracture could have been caused by defendant's "innocent act of *** trying to pick up [Bryant] from the floor, after she fell and hit her head." Counsel also suggested that the Tramadol provided by Bryant's mother may have been a "superseding criminal act" contributing to her death. The court found defendant guilty of first degree murder and sentenced him to 36 years in prison.

¶ 17     On direct appeal, defendant argued that the trial court erred in permitting introduction of prior acts of domestic violence. We rejected that argument and affirmed defendant's conviction. *Adams*, 2015 IL App (1st) 132364-U.

¶ 18     On May 26, 2016, defendant filed a *pro se* postconviction petition under the Act. In the petition, defendant argued, *inter alia*, that his trial counsel was ineffective for failing to "request that Dr. Daniel J. Spitz that gave a report to be at trial for defense." The petition did not attach the "report" by Spitz, or otherwise describe its contents. In the petition, defendant also claimed that counsel on direct appeal was ineffective "for failure to raise [the] ineffective assistance of trial counsel for failing to employ expert testimony to provide *** independent analysis on the main cause of death *** with a significant degree of certainty."

¶ 19     Also on May 26, 2016, defendant filed a *pro se* "Motion to Show Cause for Ineffective Assistance of Trial Counsel" alleging several failures by his trial counsel. Among these, the motion stated that although defense counsel "submitted a pretrial motion to call witnesses" including Spitz, a forensic pathologist, defense counsel failed to call witnesses "without informing his client of this change."

¶ 20     Defendant submitted an affidavit of service, in which he attests that on May 23, 2016, he mailed copies of the petition, his "Motion for Ineffective Assistance of Trial Counsel" as well as a "Motion to Quash and Dismiss Grand Jury Indictment with Exhibits and Argument." Although the record contains file-stamped copies of the petition and the motion regarding ineffective assistance of counsel, there is no file-stamped copy of the motion to dismiss grand jury indictment.

¶ 21     On August 8, 2016, defendant filed an affidavit, averring that he had not received a file-stamped copy of his "Motion to Dismiss Grand Jury Indictment."

¶ 22    On August 22, 2016, the trial court entered a written order summarily dismissing the petition. In that order, the court expressly indicated that it had considered the "Motion to Show Cause for Ineffective Assistance of Counsel" as part of the petition. The court found that the petition "consists entirely of a litany of assertions which are not supported with any factual details or argument whatsoever." The court noted that any ineffective assistance claim based on trial counsel's failure to call "an expert to testify regarding the main cause of death" was "unsupported by factual details." In the order, the trial court noted that it had not received the separate "Motion to Dismiss Grand Jury Indictment" referenced in defendant's August 8, 2016 affidavit. The court specified that it would "address only those filings that have been received." Thus, the court did not address the merits of the "Motion to Dismiss Grand Jury Indictment" when it denied the petition.

¶ 23    On September 21, 2016, defendant filed a motion to reconsider the August 22, 2016 denial of his petition. In the motion, he asserted that: on May 26, 2016, defendant filed his "Motion to Dismiss Grand Jury Indictment" and exhibits thereto, including them in the same envelope in which he submitted his petition. He claimed that, although he received a filed copy of the petition, he had not received a filed copy of the separate "Motion to Dismiss Grand Jury Indictment." Defendant asserted that he had then "forward[ed] a notice to the clerk's office to inform her office, she ha[d] failed to return to him a (stamped filed copy) of his Motion to Dismiss Indictment."

¶ 24    In support of the motion to reconsider, defendant attached a copy of his "Motion to Dismiss Grand Jury Indictment" and exhibits thereto. The substance of that motion claimed that, in testimony before the grand jury, investigating detective James Scannell "committed perjury" and improperly "answered 'yes' to a question only a medical examiner could answer" when he was

asked about Cogan's findings regarding Bryant's injuries. The motion asserted that defendant's constitutional rights were violated "[a]s a result of the perjured testimony."

¶ 25 One of the exhibits to the "Motion to Dismiss Grand Jury Indictment" is a January 2013 letter from Spitz to defendant's trial counsel (the Spitz letter). The letter reflects that Spitz formed opinions based upon his review of case materials, including autopsy and toxicology reports and witness statements. The Spitz letter notes that, according to defendant, on May 25, 2010 "Ms. Bryant was getting out of the bath at which time [defendant] heard her fall to the ground. *** After the fall, Ms. Bryant told [defendant] that 'she could not feel her neck' and that 'one side of her body was not moving.' "

¶ 26 The Spitz letter states that Bryant "sustain[ed] multiple injuries during the course of a physical altercation as well as injuries that are most consistent with a fall." Spitz further opines:

> "While many of the injuries are indicative of being caused secondary to a physical altercation, I do not see evidence of manual or ligature strangulation. The hemorrhage in the neck is most likely the result of bleeding associated with the cervical fracture. ***
>
> Strangulation causes death by asphyxiation either during or immediately following an episode of neck compression ***. It is completely implausible to suggest that Ms. Bryant died secondary to strangulation several days after manual compression of the neck. *** [S]trangulation/manual neck compression can largely be excluded as a potential cause of death.

   While it is clear that Ms. Bryant sustained multiple injuries during the course of an altercation, the most significant question that remains is: What was the cause of [her] death?

   As stated previously, most of the injuries suffered by Ms. Bryant *** would not be expected to cause death. However, the cervical spine fracture/dislocation is a very serious and potentially life threatening condition. It was reported by [defendant] that Ms. Bryant took a bath on May 25, 2010 and that upon exiting the bathtub she [sic] heard her fall. *** The neck injury is consistent with being caused from a fall in which there is head impact causing hyperextension or flexion of the neck. Such an injury *** would be easily exacerbated if Ms. Bryant was carried or moved.

   While the injuries sustained during the assault may be considered significant in that they left Ms. Bryant in [a] weakened state and possibly under the influence of pain medications, the cause of Ms. Bryant's death can be directly related to the cervical spine fracture/dislocation."

¶ 27 The following handwritten language appears at the bottom of the copy of the Spitz letter attached to the Motion to Dismiss Grand Jury Indictment: "My Trial Attorney failed to call any witnesses, and failed to submit this report as evidence in the case. This is a constitutional violation of defendant's 6th Amendment right." Defendant apparently added this language, although it is not clear from the record when he did so.

¶ 28    On November 14, 2016, the trial court entered an order (1) denying defendant's motion to reconsider the denial of his petition and (2) denying the Motion to Dismiss Grand Jury Indictment. With respect to the motion to reconsider, the court found:

> "Movant has not attached newly discovered evidence that was not available at the time this Court denied his petition for post-conviction relief. Movant has not demonstrated any substantive change in the law that would affect this court's decision. Finally, movant does not demonstrate that this Court erred in its prior application of the law. Instead, movant uses the motion to reconsider as an opportunity to re-argue the same facts known to this Court at the time of judgment. Movant's arguments are unavailing and he fails to present a meritorious basis to reconsider this court's original decision."

At the same time, the court denied the Motion to Dismiss the Grand Jury Indictment, remarking that defendant "cannot seek to have his indictment dismissed after he has been convicted."

¶ 29    On December 14, 2016, defendant filed a notice of appeal, stating that he was appealing from both the "post-conviction petition appeal, and reconsideration motion."

¶ 30    On appeal, defendant argues that the court erred in dismissing both his petition and his motion to reconsider because, construed together, they stated at least the "gist" of a claim that his trial counsel was ineffective in failing to call Spitz. Relying largely on the contents of the Spitz letter, he claims that Spitz's testimony about the cause of death would have "countered" Cogan's testimony and "arguably could have persuaded the trial court to acquit" him of first degree murder.

¶ 31    We note that defendant's brief does not attempt to separately analyze (1) the court's initial August 22, 2016 ruling dismissing his petition (when the Spitz letter was not before the court) and

(2) the subsequent November 14, 2016 ruling that denied his motion to reconsider. Rather, he argues that, viewed together, the petition and the motion to reconsider "set forth the gist of a non-frivolous claim of ineffective assistance of trial counsel." Defendant emphasizes that Cogan was the only trial witness who offered a medical opinion. He maintains that counsel's failure to call Spitz was arguably prejudicial since, "[a]s indicated by his letter, Spitz would have directly contradicted Cogan's testimony and provided the trial court with an alternative cause of death," *i.e.*, that Bryant died as a result of a fall.

¶ 32    Defendant's brief acknowledges that counsel's strategic decisions generally receive great deference, but he contends that the failure to call Spitz "cannot be excused as reasonable trial strategy" because "Spitz would have provided strong corroborative evidence for Bryant's death being caused by a fall rather than an assault." Citing the Spitz letter, he claims that his trial counsel's "failure to use such readily available evidence was at least arguably unreasonable and prejudicial." Accordingly, he asks that we reverse the orders dismissing his petition and denying his motion to reconsider, and that we remand for second-stage postconviction proceedings.

¶ 33    As a threshold matter, we note that, although the notice of appeal references both the denial of the petition as well as the denial of the subsequent motion to reconsider, defendant's brief does not separately discuss those rulings. Nor does defendant's brief recognize that, at the time the court initially denied the petition, the Spitz letter was *not* before the trial court. Indeed, the August 22, 2016 order of the court that denied the petition specified that it had not even received the "Motion to Dismiss Grand Jury Indictment" to which the Spitz letter was attached as an exhibit. Rather, the record indicates that the Spitz letter was not before the trial court until defendant filed the motion to reconsider the denial of the petition. We thus separately consider the propriety of (1) the denial

of the petition and (2) the denial of the motion to reconsider, keeping in mind the materials that were before the court at each ruling. We first address the denial of the petition.

¶ 34    Defendant filed his *pro se* petition pursuant to the Act, which provides a method for a criminal defendant to assert that his or her conviction was the result of a "substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). "A postconviction proceeding not involving the death penalty contains three distinct stages. [Citations.] At the first stage, the circuit court must, within 90 days of the petition's filing, independently review the petition, taking the allegations as true, and determine whether 'the petition is frivolous or is patently without merit.' [Citations]. If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. [Citation.]" *Id.* at 11. A *pro se* petition "may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *Id.* at 11-12.

¶ 35    At the first stage, "[t]he allegations in the petition must be taken as true and liberally construed. [Citation.] Nevertheless, 'nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act.' " *People v. Reed*, 2014 IL App (1st) 122610, ¶ 39 (quoting *People v. Rissley*, 206 Ill. 2d 403, 412 (2003)). "We review *de novo* the dismissal of a postconviction petition without an evidentiary hearing." *Id.* ¶ 37 (citing *Hodges*, 234 Ill. 2d at 9).

¶ 36    Defendant asserts that his petition stated a non-frivolous claim that his trial counsel provided ineffective assistance. "To prevail on a claim of ineffective assistance *** a defendant must show both that counsel's performance 'fell below an objective standard of reasonableness'

and that the deficient performance prejudiced the defense. [Citation.] At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 37    On appeal, the sole basis for which defendant claims ineffective assistance is that trial counsel did not call Spitz to provide expert testimony regarding the cause of Bryant's death. "Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel. [citations.] It is well established that these types of decisions are considered matters of trial strategy and are generally immune from claims of ineffective assistance of counsel.  [Citations.]" *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. "A defendant may overcome the strong presumption that defense counsel's choice of strategy was sound if counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." (Emphasis and internal quotation marks omitted). *Id.*  ¶ 81. The "only exception" to the general rule immunizing strategic decisions "is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' [Citations.]" *People v. West*, 187 Ill. 2d 418, 432 (1999).

¶ 38    On appeal, defendant suggests that it was unreasonable for trial counsel not to call Spitz to offer testimony consistent with his letter, in which he opined that Bryant's death may have resulted from a fall sometime after defendant assaulted her. Notably, however, the petition did not attach

the Spitz letter. Thus, we consider whether the petition, as it was originally presented to the trial court, set forth an arguable claim of ineffective assistance of counsel.

¶ 39    A postconviction petition "cannot consist of nonfactual and nonspecific assertions that merely amount to conclusions that errors occurred at trial. [Citations.] Rather, a petition filed under the Act must 'clearly set forth the respects in which petitioner's constitutional rights were violated.' " *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 54 (quoting 725 ILCS 5/122-2 (West 2008)). Unsupported allegations of ineffective assistance are insufficient to avoid first-stage dismissal. See *People v. Ivy*, 313 Ill. App. 3d 1011, 1019 (2000) ("the postconviction petition stated mere conclusory allegations without factual support that appellate counsel was ineffective for failing to challenge the denial of his motion to withdraw his guilty plea").

¶ 40    Here, we find that the trial court did not err in summarily dismissing defendant's petition where he failed to support his allegations of ineffective assistance of trial counsel. Our *de novo* review of the petition shows that it merely offered conclusory statements that Spitz should have been called, without attempting to explain *how* his testimony might have benefitted defendant. For example, it asserted that trial counsel was ineffective for failing to "request that Dr. Daniel J. Spitz that gave a report [sic] to be at trial for defense." However, the petition did not describe the contents or conclusions of any "report." The petition elsewhere stated that trial counsel was ineffective "for failing to employ expert testimony to provide the defense independent analysis on the main cause of death of the deceased, with a scientific degree of certainty." However, nowhere in the petition did defendant suggest what such "independent analysis" might conclude about how Bryant died, or how that hypothetical expert testimony would contradict the State's evidence. The petition merely contained vague, conclusory statements about counsel's supposed ineffectiveness in failing

to call Spitz, without specifying any supporting facts or evidence. Such statements do not overcome the presumption that trial counsel's strategy was reasonable, or amount to an arguable claim that defendant was prejudiced by counsel's decision not to call Spitz at trial. See *People v. Delton*, 227 Ill. 2d 247, 258 (2008) (petition's allegation that counsel was "ineffective for failing to interview all possible witnesses to the incident" without "alleg[ing] that someone actually saw or heard the incident" was "nothing more than a broad conclusory allegation of ineffective assistance of counsel"); *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 16 ("broad conclusory allegations of ineffective assistance of counsel are not sufficient to avoid a summary dismissal"). We thus conclude that the petition did not raise an arguable claim of ineffective assistance of counsel. Accordingly, we affirm the summary dismissal of the petition.

¶ 41    We next address the court's separate ruling, denying defendant's motion to reconsider the denial of his petition. We again note that the parties do not separately analyze that ruling. Furthermore, it is unclear from the record precisely what defendant intended to argue in the motion to reconsider. The body of the motion to reconsider did not articulate any specific alleged errors of law by the trial court. As an exhibit to the motion to reconsider, defendant attached the "Motion to Dismiss Grand Jury Indictment" which, in turn, attached the Spitz letter. However, the body of the motion to reconsider made no specific reference to the Spitz letter or the opinions contained therein. Further confusing matters, the substance of the argument in the "Motion to Dismiss Grand Jury Indictment"—concerning a detective's testimony during grand jury proceedings—is unrelated to any claim of ineffective assistance of counsel. Nevertheless, defendant on appeal suggests that the Spitz letter supported his petition's claim that his trial counsel was ineffective.

¶ 42    "A ruling on a motion to reconsider is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *State Farm Mut. Automobile Ins. Co. v. Trujillo*, 2018 IL App (1st) 172927, ¶ 26 (quoting *Robideaux v. Oliphant*, 201 Ill. 2d 324, 347 (2002)). "The purpose of a motion to reconsider is to bring to the court's attention newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's application of the law." *Evanston Ins. Co. v. Riseborough*, 2014 IL 114271, ¶ 36. In the context of a postconviction petition, our court has explained:

> "A defendant may file a motion to 'reconsider,' or to vacate, the summary dismissal of a postconviction petition (735 ILCS 5/2-1203(a) (West 2010); *Dominguez*, 366 Ill. App. 3d at 472) and one of the purposes of a motion for reconsideration is 'to bring to the court's attention newly discovered evidence' (*Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 23). If the motion for reconsideration presents new evidence, it lies within the trial court's discretion whether to consider the new evidence. [Citations.]" *People v. Coleman*, 2012 IL App (4th) 110463, ¶ 62.

"Newly discovered evidence is evidence that was not available prior to the first hearing. [Citation.]" *Compton v. Country Mut. Ins. Co.*, 382 Ill. App. 3d 323, 331 (2008).

¶ 43    After reviewing the record, we find that the trial court did not abuse its discretion in denying defendant's motion to reconsider the denial of his petition. The record shows that defendant's motion to reconsider did not identify any changes in the law or allege any specific errors in the trial court's application of the law in denying his petition. Rather, it appears to have been premised on the notion that the Spitz letter was "new" evidence supporting the petition's

ineffective assistance of counsel claim. In the order denying the motion to reconsider, the court did not explicitly reference the Spitz letter but stated that defendant "has not attached newly discovered evidence that was not available at the time this Court denied his petition for post-conviction relief." In the same order, the court explicitly denied as meritless the motion to dismiss the grand jury indictment.

¶ 44    Here, it is apparent from the record that the Spitz letter was *not* newly discovered evidence when it was first submitted to the court in conjunction with the motion to reconsider. First, the letter reflects that it was provided to defendant's trial counsel on or about January 23, 2013; defendant has not suggested that he lacked access to it. More importantly, by defendant's own admission, the Spitz letter was available to him at the time he filed his petition in May 2016. His motion to reconsider claims that he mailed the "Motion to Dismiss Grand Jury Indictment" (to which the Spitz letter was an exhibit) on May 26, 2016, *the same date on which he mailed the petition*. Thus, the Spitz letter was clearly available to defendant when he submitted the petition, yet he did not include the Spitz letter as an exhibit to that petition. Simply put, the record makes clear that the Spitz letter was not "newly discovered evidence" for purposes of the motion to reconsider.

¶ 45    We further note that, even assuming that the Spitz letter could have been considered "new evidence" in support of the petition, we would nevertheless conclude that it was insufficient to support an arguable claim of ineffective assistance of counsel. That is, even with the Spitz letter, the petition would not present even an "arguable" claim that counsel's performance fell below an objective standard of reasonableness, or that defendant was prejudiced as a result. *Hodges*, 234 Ill. 2d at 17.

¶ 46    First, we do not find that the contents of the Spitz letter are such that they overcome the strong presumption that trial counsel's decision not to call him was reasonable. That is, we cannot say that the decision not to call Spitz was "so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *Wilborn*, 2011 IL App (1st) 092802, ¶ 80. There could be many reasonable explanations for why defense counsel decided against calling Spitz at trial. For example, the Spitz letter reflects that Spitz's opinion on the cause of death was based on defendant's out-of-court statements, including his claim that Bryant fell after she took a bath. As suggested by the State, defense counsel may have reasoned that calling Spitz "could have pressured defendant to provide his version of the events" which would be inconsistent with defendant's decision not to testify.

¶ 47    Further, even assuming that counsel's decision not to call Spitz was unreasonable, we could not find that it arguably resulted in any prejudice under the facts of this case. To establish prejudice from ineffective assistance of counsel, there must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different; a "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *People v. Scott*, 2011 IL App (1st) 100122, ¶ 27 (quoting *Strickland v. Washington*, 466 U.S. 668 (1984)). Even had Spitz testified, we fail to discern any reasonable probability that defendant would have been acquitted, given the other evidence in the case. As we noted on direct appeal, "the evidence against defendant—which included the extensive testimony of Dr. Cogan as to the nature of [Bryant's] injuries, defendant's admission that he hit [Bryant] and should have called 911, and defendant's statement that he did not call the authorities for fear of prosecution—was overwhelming." *Adams*, 2015 IL App (1st) 132364-U, ¶ 38.

¶ 48    Defendant suggests that the trial court may have acquitted him, had Spitz testified to his opinion that Bryant could have died due to a fall after defendant inflicted her other injuries. We disagree. As mentioned, Spitz's conclusion depended in large part on defendant's out-of-court statement that he heard Bryant fall upon exiting a bathtub. We strongly doubt that the trial court would have given much weight to the credibility of defendant's underlying statement, especially considering the evidence of defendant's many other incriminating statements to other witnesses. Further, nothing in Spitz's letter contradicts the ample evidence that defendant subjected Bryant to a severe beating on Saturday, May 22 and that he declined to seek medical attention for her until she died on Wednesday, May 26. Even had Spitz testified consistent with his letter, we do not find even an arguable probability that the outcome at trial would have been different. For this additional reason, the motion to reconsider was properly denied.

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 50    Affirmed.

¶ 51    PRESIDING JUSTICE GORDON, specially concurring:

¶ 52    I concur in the judgment but only for the reasons stated by the majority in paragraphs 47 and 48. In order to prevail on a claim of ineffective assistance of counsel, a defendant must establish both prongs of the familiar *Strickland* test. *People v. Williams*, 2020 IL App (1st) 162512, ¶ 83; *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 79. As a result, if the defendant cannot establish prejudice, there is no need for us to consider whether counsel's performance was unreasonable. *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 77 ("We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied."). If the ineffective assistance claim is raised in a postconviction petition and the petition is being considered at the first stage,

the question concerning prejudice is whether it is arguable that there was prejudice. *Carlisle*, 2019 IL App (1st) 162259, ¶ 75 (citing *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010) (a petition alleging ineffective assistance of counsel may not be summarily dismissed if it is arguable that defendant was prejudiced *and* his counsel's performance was unreasonable)).

¶ 53    In the case at bar, it is not even arguable.   The evidence in this case of guilt was overwhelming.  Defendant admitted that he hit his girlfriend, that he should have called 911 and that he did not call 911 out of a fear of prosecution.  When the girlfriend's dead body was discovered, her face and neck were battered.  Defendant's own sister testified that defendant called her when the girlfriend was still alive and she observed the girlfriend laying on the floor and moaning.  Defendant told his sister that he had been "putting [the girlfriend] in and out of the tub all day and she asked me to just let her lay there on the floor."  When his sister told him that his girlfriend needed to see a doctor, defendant stated he was afraid of trouble.  When the sister told him to call the paramedics, defendant responded that the girlfriend's mother had brought over "some medication" and "Ben Gay" and that she "will be okay."  Earlier, defendant had phoned the girlfriend's mother asking her to bring over Bengay and pain pills, but when the mother came over, defendant met her outside the apartment.  A detective who later viewed the body testified that the victim's neck was swollen, her face had contusions and her upper chest had subcutaneous hemorrhaging.  Defendant had a long history of domestic violence.  At trial, testimony was introduced about uncharged domestic violence by defendant in 1997, 1998 and 2001.

¶ 54    Dr. Joseph Cogan, a forensic pathologist, who conducted an autopsy on the victim, testified that the victim had multiple blunt force injuries to her head, neck, upper chest and upper arms; black eyes consistent with being punched; neck injuries consistent with a chokehold; a fractured

rib; and a fracture of the cervical spine. He testified that it looked "as if th[e] head and neck were just literally torn off the thoracic spine," and that the fracture was consistent with a "V-shaped choke-hold." Dr. Cogan opined that the victim "died as a consequence of multiple blunt force injuries, and that was due to an assault."

¶ 55 On this appeal, defendant claims that his attorney was ineffective for failing to call Dr. Daniel J. Spitz, a defense expert. In support of his petition, defendant submitted a letter from Dr. Spitz which states that, according to defendant, the victim was exiting the bath when defendant "heard her fall to the ground" and that, afterward, the victim told defendant that she could not feel her neck and one side of her body was not moving. The Dr. Spitz letter concludes that the victim sustained multiple injuries during a physical altercation, as well as injuries that were consistent with a fall. Dr. Spitz concluded that "the cause of [the victim's] death can be directly related to the cervical spine fracture/dislocation."

¶ 56 I cannot find prejudice from defendant's own self-serving assertions about a fall that only he "heard" and, apparently, did not even witness—particularly when these new assertions contradict his sister's testimony that defendant told her that *he* had been "putting" the girlfriend "in and out of the tub all day" and that "she asked me to just let her lay there on the floor." Dr. Spitz's letter only has some value if there is evidence of a fall for which defendant was not the cause.

¶ 57 In light of the overwhelming evidence of defendant's guilt, I cannot find that prejudice is even arguable. *Carlisle*, 2019 IL App (1st) 162259, ¶ 81 ("[t]he overwhelming evidence of defendant's guilt in this case precludes defendant from being capable of showing that there was a

reasonable probability that the outcome of this case would have been different"). For this reason,

I specially concur with the judgment.