2023 IL App (1st) 220912-U
No. 1-22-0912

FIRST DIVISION
December 26, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No.  05 CR 28068 |
| | ) | |
| DOUGLAS LEMON, | ) | |
| | ) | The Honorable |
| Petitioner-Appellant. | ) | Neera Lall Walsh, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held:* Second-stage dismissal of defendant's postconviction petition is affirmed where defendant failed to make a substantial showing of any constitutional violations.

¶ 2   On appeal from the second-stage dismissal of his amended petition for postconviction relief, defendant, Douglas Lemon, argues that the circuit court erred in granting the State's Motion to Dismiss where he made a substantial showing that trial counsel was ineffective for failing to call two exculpatory eyewitnesses to impeach the victim's testimony that defendant sexually assaulted her. Previously, in reviewing the trial court's summary dismissal of his postconviction petition, we

remanded this case for second stage postconviction proceedings after we found that the trial court rendered its decision without having considered the affidavits filed by defendant. *People v. Lemon*, 2016 IL App (1st) 140495-U (unpublished order pursuant to Illinois Supreme Court Rule 23). For the following reasons, we affirm.

¶ 3                                                    BACKGROUND

¶ 4         Defendant was charged with eight counts of aggravated criminal sexual assault, four counts of aggravated kidnapping, two counts of criminal sexual assault, and one count of aggravated battery involving D.J. ("victim"), which occurred on November 15, 2005. Four of the eight counts charged defendant with aggravated criminal sexual assault in that defendant committed an act of sexual penetration by the use of force or threat of force and he displaced a dangerous weapon, to wit: a knife. 720 ILCS 5/11-1.30(a)(1) (West 2016). The other four counts charged him with aggravated criminal sexual assault by the use of force of threat of force and it was perpetrated during the commission of the felony offense of kidnapping. 720 ILCS 5/11-1.30(a)(4) (West 2016). Following a bench trial, defendant was convicted of three counts of aggravated criminal sexual assault involving the use of a dangerous weapon, two counts of aggravated criminal sexual assault perpetrated during the commission of the felony offense of kidnapping, one count of aggravated kidnapping, and one count of criminal sexual assault with force, which merged with one of the counts of aggravated criminal sexual assault. The trial court subsequently sentenced him to an aggregate term of 40 years' imprisonment in the Illinois Department of Corrections.

¶ 5         The evidence introduced at defendant's bench trial is summarized below, relevant to the issues on appeal but is more thoroughly recounted in our Rule 23 order on direct appeal. *People v. Lemon*, 2012 IL App (1st) 102932-U (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 6                                    **Pre-Trial Proceedings**

¶ 7        When the pre-trial proceedings commenced, defendant was represented by an assistant public defender. Several times, during the pre-trial proceedings, defense counsel stated that she was interviewing witnesses, including "the large number of witnesses that [she] was given by [defendant]…" At one point, when defendant sought to proceed *pro se*, he stated to the trial court that his defense counsel only reached out to certain witnesses, with one of the witnesses being his brother, Johnny Lemon. Defendant stated that a defense investigator told these witnesses that they were not needed for trial. In response, defense counsel stated that she had visited with defendant, had notes from the meetings, and that she explained to defendant the types of evidence that "could be used to potentially prove up" the charges against him at trial. Defense counsel also explained that "[w]e discussed his defense as I see it, and we discussed the issue of the witnesses that he had given to me." Counsel stated that two different investigators had attempted to locate his witnesses, they were unable to locate all of them, and that she had not been contacted by any witnesses. At that point, the trial court allowed defendant to proceed *pro se*.

¶ 8        Subsequently, defense counsel was reappointed to represent defendant for a fitness hearing. On the date of the hearing, after the trial court found him to be fit to stand trial, the trial court also found defendant in direct contempt of court after the trial court found that he had refused numerous requests to sit down, became physically combative with three sheriff officers, and damaged a table. The trial court sentenced defendant to six months imprisonment.

¶ 9        On June 23, 2009, prior to trial, defendant filed a supplemental answer to discovery in which he included Johnny Lemon as one of six potential witnesses. Defendant asserted the affirmative defense of consent.

¶ 10      On April 5, 2010, defendant exercised his right to waive a jury trial. Immediately prior to opening statements in the bench trial, defendant informed the trial court that "I want to state for the record that I had the opportunity to talk to both my attorneys about a potential witness that I really would like - - wanted to testimony on my behalf. But, they felt as though they didn't want him to testify, which is Johnny Lemon. I just want to state that for the record." Defense counsel stated that, "I explained to him that it is a strategic decision about what witnesses will be called, Judge." The trial court stated that Johnny Lemon was included on the defense witness list. Defendant stated, "Yes, your Honor. But, it's just that particular part I wanted him to testify to. He was excluded from. I want to bring that up for the record." The trial court informed defendant that this person is on the witness list and his attorneys "are making that decision about who to call."

¶ 11                                                    **Trial**

¶ 12      At trial, the State presented the testimony of the victim, Shirley Pearson, Willie Dennis, Sergeant Robert Renter, Doctor Steven Ross, Sarah Applehoff, and Detective Jose Cardo. Defendant presented the testimony of Detective Tracy Fanning, Calvin Lemon, and Marchella Winters.

¶ 13                                    **Victim's Trial Testimony**

¶ 14      The victim testified that her date of birth was August 5, 1989. On November 14, 2004, after her friend, Shirley Pearson called defendant, he picked them up at approximately 7:30 p.m. from the victim's mother's house, located in the Austin neighborhood in the city of Chicago. This was the first time that the victim met defendant, and Shirley introduced him as "Vino." Defendant, the victim, Pearson and others ended up "partying" in the alley behind defendant's home. All of them drank alcohol, and Pearson also smoked marijuana. The victim testified that she drank one to one

and a half cups of vodka or gin, and denied that she was inebriated or intoxicated. She noticed that defendant's speech was slurred and smelled alcohol on his breath.

¶ 15    The victim and defendant left the alley for 20 to 30 minutes to go to the liquor store at approximately 11:30 p.m., leaving the others in the alley. They returned to the alley, but the others were no longer there. The victim called Pearson from defendant's cellular phone at approximately 1:10 a.m. because the victim did not have a phone. Defendant then told the victim that his mother was sick, he had to get something from inside his house, and he did not want to leave her alone in the alley. The victim was unsure of the address of defendant's home.

¶ 16    The victim testified that, on the way to defendant's home, the two of them passed through a gate that had barb wire on the top of it. When she stood outside the gate, she could not see what was behind the gate. She described the exterior of defendant's home as "dirty" with a window that was covered and "dark. You couldn't see out of it." She described the interior of the building as "mess[y], dirty, junky, little, small, compact." She could not see out of the window from the inside because there "was stuff blocking…things on the wall."

¶ 17    Prior to entering defendant's home, he had not made any advances towards her and had not been aggressive. However, when the victim entered defendant's home, his attitude changed. He became angry and aggressive, and pushed her backward onto the bed. She tried to get up, but defendant stood in front of her and drew his fist back approximately 14 inches from her face. He told her, "Bitch, don't move." The victim got scared and told defendant to stop and let her out. Defendant did not allow the victim to move away from him. She told defendant that she was 16.

¶ 18    At that point, defendant sexually assaulted the victim with contact between his mouth on her vagina and contact between his penis and her vagina. He put some type of substance on her buttock and then started hitting her in the buttock with his hands "quite a few times." While this was

happening, defendant was cursing her and she was crying, screaming and begging him to stop. At one point, she heard a clicking sound, but she was unsure what was making that sound. She tried to turn around to see what was happening, but defendant pushed her forward. Defendant threw a knife towards the wall, close to the side of her waist, and then forced her to dance for him. She testified that defendant forced her to give oral sex to him, he performed oral sex on her, and then forced his penis into her vagina. The victim was unable to recall how long the sexual acts lasted.

¶ 19    Defendant fell asleep, and the victim waited "a little while" before she grabbed a "big" "folding" knife that she found, as well as defendant's cellular phone. The victim found some of her clothing and called her boyfriend, Willie Dennis, using defendant's cellular phone, and told him what happened. Then, she called 911. While she spoke to the 911 operator, she was crying, shaking, and trying to figure out how to get outside. At trial, the audio of her conversation with the 911 operator was played, and she identified photos taken showing the exterior and the interior of defendant's home. Once outside, she started running. She could not tell the 911 operator of her location, but the police found her as she was running down the alley. She then led the police back to defendant's home and identified him as the attacker. The police transported her to West Suburban Hospital where medical personnel performed a sexual assault kit while treating her. She spoke to some officers while she was in the hospital and later that day after she left the hospital.

¶ 20    On cross-examination, defense counsel impeached the victim with a telephone conversation when the victim called her mother's house after returning to the alley to find that Pearson had left. The victim told her mother that she was on her way to her grandmother's house, and that she was with Pearson, which was not the truth. The victim denied telling Detective Fanning that only she took off her clothing while inside defendant's home. On redirect examination, the victim testified that, when standing outside defendant's home, she could not see inside of it.

¶ 21                                    **Shirley Pearson's Trial Testimony**

¶ 22      Pearson testified that at approximately 7:00 p.m. on November 14, 2005, while she was at the home of the victim's mother, she called defendant. Defendant picked up the victim and Pearson, and then Decorion Jackson and "Gigi" and he eventually drove to a liquor store and then to an alley. They were "hanging out" in the alley, and people were drinking, including defendant and the victim. At one point, defendant and the victim left to go to the liquor store. She testified that she did not go with them because defendant told her not to go. During the time that she spent with defendant and the victim, she did not see any flirting, physical contact, or any "advances" made by either of them towards each other. Then, she and Decorian Jackson left the alley, and she eventually went to sleep at the home of the victim's mother.

¶ 23      At approximately 6:30 a.m. on November 15, 2005, the police arrived at the victim's mother's home, and Pearson later showed the police the location of the alley where she had been with defendant and the victim. The victim arrived in the alley while she was still there.

¶ 24                                    **Willie Dennis's Trial Testimony**

¶ 25      Willie Dennis testified that the victim was his girlfriend. At approximately 6:00 a.m. on November 15, 2005, he received a call on his cellular telephone from a phone number that he did not recognize. He answered the phone and heard the victim's voice. The victim sounded shaken, scared, and was whispering. The victim told him, "help me, some guy kidnapped and raped me, I don't know where I am at." Dennis told her to try to find a way out and call the police. The victim told him that she could not find a way, and they ended the call. Dennis then went to the home of the victim's mother, and he remained there until the victim came home after being treated at the hospital.

¶ 26                                 **Sergeant Robert Renter's Trial Testimony**

¶ 27    Sergeant Robert Renter testified that at 5:50 a.m. on November 15, 2015, he responded to a police radio dispatch call. At 6:14 a.m., he found the victim in an alley in the 500 block of North Lavergne, holding a large knife in one hand and a cellular phone in the other hand. He described her as being "frantic…panicked, she had tears in her eyes." The victim was also waving a "fairly large" knife around, and Sergeant Renter took it away from her. The victim was also holding a cellular phone. Sergeant Renter told her to end her conversation on the phone, to calm down and to talk to him. They walked through the alley so the victim could point out where the attack occurred. The victim pointed to a fence and, after the sergeant opened up the gate, she pointed to a building in the rear of that property. Sergeant Renter testified that there was a residence in the front of the property, and at the rear of the property, there was a garage and another building which he "thought was a tool shed…" This tool shed had a door and "burglar bars" or "scissor gates" on it. It was approximately ten feet by ten feet in diameter and was "a makeshift little one-room apartment…" He described the interior as being "very dark" with a window "covered by a blanket or sheet, something like that." There was a bed and some chairs inside the shed. When he approached with the victim, the door to the tool shed was ajar. He looked inside and saw a black male, who was naked, face down on a bed. The victim pointed to that person, identified in court as defendant, and said "That's him, That's him."

¶ 28                        **Doctor Steven Ross' Trial Testimony**

¶ 29    Doctor Steven Ross testified that he was the emergency room doctor at West Suburban Hospital who treated the victim on the morning of November 15, 2005. During his evaluation for a report of a sexual assault, the victim told him that she had been penetrated both orally and vaginally and said that a knife had been used. He did not find any evidence of bleeding, lacerations, bruises, or swelling. As part of a sexual assault kit, he took cultures to test for the presence of

sexually transmitted diseases, as well as for the presence or absence of semen. In his opinion, the victim did not appear to be intoxicated.

¶ 30                              **Nurse Sarah Conroy Applehoff**

¶ 31         Sarah Applehoff testified that she was working as a nurse in the emergency room of West Suburban Hospital where the victim was treated on November 15, 2005. The victim reported to a triage nurse that she had been sexually assaulted, including vaginal and oral intercourse, three or four hours before she arrived at the hospital. In Ms. Applehoff's opinion, the victim did not appear to be under the influence of drugs or alcohol. The victim told her that the offender had penetrated her vagina with his penis, along with performing oral sex on each other. The victim denied that the offender penetrated her rectum but stated that he rubbed Vaseline on her buttocks. She was unsure if the offender had ejaculated, but she reported that he did not use a condom. Ms. Applehoff read aloud what she had written in her report as to what the victim told her, "He forced himself into me and threw a knife against the wall." "I tried to make him use a condom, but he wouldn't." "He made me dance for him and kept spanking my butt." "…[S]he was forced to perform oral sex on the assailant and the assailant performed oral sex on the patient." "While lifting her legs in the air, she was burned on her left leg with a cigarette." Ms. Applehoff collected a pair of blue jeans, a white belt, and black underwear from the victim.

¶ 32                    **Chicago Police Detective Jose Cardo's Trial Testimony**

¶ 33         Detective Jose Cardo testified that he interviewed the victim at West Suburban Hospital, along with Detective Tracy Fanning. The interview lasted 20 to 30 seconds. The victim appeared "like she was going to vomit…" Based on the victim's condition, the detectives ended the interview. Detective Cardo next interviewed the victim at the station at approximately 11:45 a.m. when she arrived with her mother. At this time, she appeared calm and was able to articulate what happened

to her. The defense then called Detective Cardo as a witness, and the detective testified that the victim never told him that she heard a clicking noise behind her, and he did not recall whether she told him that she told defendant that she was 16 years old.

¶ 34                                                    **Stipulations**

¶ 35        The parties agreed to the following stipulations during the State's case-in-chief:

- Erin Hanson, a supervisor and record keeper for the Chicago Office of Emergency Communications (OEC), would testify that at 5:50 a.m., on November 15, 2005, a 911 call was placed by the victim from a certain cell phone number. While the victim was able to provide the 911 operator with an approximate location, the OEC was able to determine her general location and it was dispatched to 15th District police officers. A true and accurate recording of this conversation was introduced into evidence.

- Detina Wallace, a forensic scientist in the DNA index and laboratory section of the Illinois State Police Forensics Sciences Command, would be qualified as an expert in the field of forensic biology. In 2006, she tested the criminal sexual assault evidence collection kit from the victim containing oral and vaginal swabs. Within a reasonable degree of scientific certainty, she identified semen on the vaginal and oral swabs. She preserved them for future DNA analysis.

- Kelly Biggs, a forensic scientist in the forensic biology/DNA section of the Illinois State Police Forensics Sciences Command would be qualified as an expert in the field of forensic DNA analysis. She obtained a DNA profile from the victim and defendant and conducted a DNA analysis on the vaginal swabs collected from the victim. Within a reasonable degree of scientific certainty, she determined that a mixture of DNA profiles was identified from the vaginal swabs, consistent with having originated from two people. A male DNA profile

matched the DNA profile of defendant, which would be expected to occur in approximately one in 840 trillion black, one in 48 quadrillion white, and one in 23 quadrillion Hispanic unrelated individuals. The female DNA profile matched the DNA profile of the victim. She did not analyze the oral swabs.

- Chicago Police Officer Daniel Vasquez, an evidence technician, took photographs and retrieved items of physical evidence from the scene. He subsequently inventoried several items including an "ornamental knife with an accompanying scabbard 11 inches long[.]" The "gold dragon folding knife" was recovered and inventoried by Sergeant Robert Rentner.

- Dina Navarro, a keeper of records for U.S. Cellular, testified as to defendant's cell phone records from November 14-15, 2005, showing incoming calls and outgoing calls.

¶ 36                                                  **Defense Case**

¶ 37       Defendant presented the testimony of Chicago Police Detective Tracy Fanning, his brother, Calvin Lemon, and his best friend, Marchella Winters.  Detective Fanning testified that he was by himself when he interviewed the victim at West Suburban Hospital at 7:00 a.m. on November 15, 2005. In his opinion, the victim appeared to be "inebriated…" but he did not detect the odor of alcohol and the victim did not have slurred speech. The victim told him that "she had ended up partying alone with [defendant] at the scene…" The victim also told him that she was drinking from a plastic cup and that she had taken off her own clothes. The victim did not tell him that her underwear had been ripped, that defendant had pulled off her clothes, or that she told defendant that she was 16 years old. The interview lasted two to three minutes. Detective Fanning also testified that she went to the scene and described the defendant's home as a ten-foot by ten-foot

structure with a single entry door containing a bed, a "make-shift" toilet, a chair, a tv hanging on the wall, a heater, several knives, and containers of clothing.

¶ 38    On cross-examination, Detective Fanning testified that the victim told him that defendant forced her to remove her clothing, but she removed the clothing herself. The detective explained that the primary purpose for this interview was to determine the evidentiary value of items at the scene, and not to obtain details of what happened to the victim. Detective Fanning returned to the hospital a second time but was unable to interview the victim.

¶ 39    Calvin Lemon testified that on November 14, 2005, between 10 and 11 p.m., he was selling items in front of a liquor store when he saw defendant drive up. He saw a female passenger in the front seat and other people seated in the back seat. He spoke with defendant at that time, defendant went inside the store, and then left in his own car. Then, at 11:30 p.m., he went to defendant's home to talk to him. He "couldn't get to him at the time [because] the female came to the door." He saw the female standing in the rear of the residence. The female did not appear to be upset and was intoxicated, "joyful" and "[l]aughing." He testified that he had not seen the female "at any point earlier in the evening[.]"

¶ 40    Marchella Winters testified that she encountered the victim and defendant in the alley by defendant's car and near the garage of defendant's home. She stated that the victim told her that she was 18 years old.

¶ 41    The trial court found defendant guilty of five counts of aggravated criminal sexual assault, one count of aggravated kidnapping, and one count of criminal sexual assault. After merging the one count of criminal sexual assault with one of the counts of aggravated criminal sexual assault, the trial court subsequently sentenced him to an aggregate term of 40 years' imprisonment in the Illinois Department of Corrections.

¶ 42                                    **Direct Appeal**

¶ 43    Defendant challenged his conviction on direct appeal and alleged that the State failed to establish his guilt beyond a reasonable doubt. On May 29, 2012, we affirmed defendant's conviction and sentence. *People v. Lemon*, 2012 IL App (1st) 102932-U (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 44                              **Postconviction Petition**

¶ 45    On August 29, 2013, petition filed a *pro se* postconviction petition in which he argued, in part, that his constitutional right to effective assistance of trial counsel was violated where his trial counsel failed "to call alibi witness and eyewitness to the alleged sexual assault." He alleged that his trial counsel should have called Decorian Jackson, Johnny Lemon, Joseph Wilkins Jr., Arzestery Davis, and Calvin Lemon to testify on his behalf. He argued that the presumption that his counsel's decision to not call these witnesses amounted to trial strategy was overcome where counsel's decision appears so irrational and unreasonable that no reasonably effective attorney, facing similar circumstances, would pursue such a strategy. He also argued that he was prejudiced where the inclusion of this additional evidence would have resulted in a different outcome. He did not attach any affidavits to his petition.

¶ 46    On October 20, 2013, defendant filed a motion to amend his petition as well as a motion to hold his case in abeyance. He attached his own affidavit, three affidavits from Johnny Lemon all dated June 28, 2009, and one affidavit from Arzestery Davis dated February 14, 2007. Petitioner wrote that additional affidavits are being mailed to him, and "I will amend my affidavit exhibits to my original post-conviction relief petition, as soon as I recieve [sic] them, soon."

¶ 47    On November 19, 2013, the circuit court, in a written order, summarily dismissed defendant's *pro se* postconviction petition. In particular, as to defendant's claim that trial counsel was

ineffective for failing to call Johnny Lemon, Jackson and others as witnesses, the court initially found that defendant had not overcome the presumption that trial counsel's conduct was a matter of trial strategy. It stated that defendant could not overcome this presumption because it had not received affidavits from those individuals despite defendant's promise to provide them.

¶ 48      On appeal of the summary dismissal of defendant's postconviction petition, we found that, "For reasons that are not addressed by the parties or apparent from the record, the affidavits of Johnny Lemon did not make their way to the circuit court judge when she ruled on defendant's petition." *People v. Douglas Lemon*, 2016 IL App (1st) 140495-U, ¶ 16 (unpublished order pursuant to Illinois Supreme Court Rule 23). We declined to consider the materials, which were not before the trial court when it denied the petition, for the first time on appeal. *Id.* Instead, we reversed and remanded the petition for further proceedings before the circuit court. *Id.* ¶ 18.

¶ 49                    **Second-Stage Postconviction Proceedings**

¶ 50      On remand, defendant's case was placed back on the trial court's call so that it could reconsider its ruling in light of the affidavits which were not previously provided to the trial court. Among the affidavits submitted to the court were three affidavits from Johnny Lemon and one affidavit from Joseph Wilkins.[1] All of Johnny Lemon's affidavits were dated June 28, 2009, prior to defendant's trial being commenced on April 5, 2010. In one affidavit, he averred that he told defense counsel that what occurred between defendant and the victim on the night in question and that defendant was innocent. In another affidavit, Johnny Lemon averred that he received "negative vibes" and negative attitude" from defense counsel. He averred that defendant and defense counsel did not get along and defense counsel would not allow him to fully explain what happened because

---

[1] During this proceeding, defendant submitted, and the circuit court considered, two affidavits from Arzestery Davis and three affidavits from Decorian Jackson. However, defendant does not rely upon these affidavits to support his claim on appeal.

defense counsel "being female gender and being feminism stereotype prejudice from feeling it's a crime of men mainstream [sic] directly aimed towards women." He further averred that he was present at trial "more than ready to testify" but defense counsel would not put him on the stand "as she knew that i [sic] would be key testimony which to prove [sic]" defendant's innocence.

¶ 51     In the third affidavit, Johnny Lemon averred that on the evening of November 14, 2005, he saw defendant, his brother, hanging out in the alley with the victim, Decorian Jackson, Shirley Pearson, and "Gi Gi" around 8:00 p.m. He saw the victim "sitting up front in [defendant's] car next to [defendant], as she was drinking alcohol while having a good ol' time laughing and singing out loud…" He had previously seen the victim "hanging in the alley with [defendant]" approximately a month before. He stated that defendant sold marijuana, alcohol, and cigarettes for a living. He later saw the victim help defendant out of his car and to walk down the alley, through the back gate, and into the "cottage" that he shared with defendant. He explained that defendant stayed in the front half of the cottage while he stayed in the back half of the cottage. At that point, he was standing between the "cottage" and the garage along with defendant's friends, "Joe & Candy." He stated that defendant "was much too drunk to even walk" and the victim "took full control of the entire situation."

¶ 52     Johnny Lemon averred that he was in the back part of the cottage when defendant and the victim walked towards him. He told "Joe & Candy" to come towards him "in order to get out of sight." From the back room, Johnny Lemon saw defendant and the victim sit down on the bed, then the victim began to undress defendant and herself. The victim "kept trying to get [defendant] to wake up & focus (but [defendant] had been unconscious from the very moment he was escorted from the car, inside of the cottage)." The victim "continued to feed [defendant] more alcohol & cigarettes." The victim attempted to engage in a sex act with defendant during which she

unsuccessfully attempted to put a condom on him and "tossed the condom to the side." The victim climbed on top of defendant, inserted defendant's penis into her vagina, and "began to hum away for a while…. for approximately 40 minutes…" At 2:30 a.m., he "had seen enough of her freaky stuff" so he told "Joe & Candy" that he was going into the family home for a while. Johnny Lemon further averred that he saw the victim put some "[w]hite powder substance" into defendant's drink before he left to go into the family home. He thought that the drug was "ecstasy which is supposed to be considered a 'Love Drug…'" Later, defendant told him that he would not use ecstasy.

¶ 53    Johnny Lemon averred that they were able to see everything through a "five-by-five square foot plexiglas[s] window" which divided the two rooms as a wall. He averred that the window was covered up with "dark see thru curtains…" and that the people on the other side of the window would not know that he was on the other side. Later, at 5:00 a.m., while he was "inside the residence of 506 N. Lavergne" he heard loud hollering and banging coming from the rear of the family residence. He heard "Joe & Candy" "fussing, banging & hollering" for the victim to open up the door. He went back to the cottage, and he saw the victim "franticly [sic] put on her clothes" and grab defendant's "money bag." She also grabbed defendant's cellular phone and threatened to call the police if the three of them did not leave. The three of them hid, and the victim yelled "I know yalls [sic] out there, that's why im [sic] calling the police!" When a police car appeared 15 to 20 minutes later, the three of them scattered. When he saw defendant getting arrested, he "fell back completely" because he thought defendant was getting arrested for possessing marijuana and he did not want to get involved.

¶ 54    Joseph Wilkins Jr.'s affidavit, dated June 28, 2009, averred that at 8:20 p.m. on November 14, 2005, he was looking for defendant and saw him in an alley sitting "inside the trunk of his car with his female friend." The two of them were hugging and kissing while drinking gin. Wilkins

and defendant began to converse when the female interrupted and asked him if he wanted a drink to celebrate the birthday of her girlfriend. Wilkins asked her age, and she said that she was 19. There were also three people in the back seat of defendant's car who were smoking marijuana. He and defendant agreed to meet up later that night.

¶ 55    At approximately 10:45 p.m., he was in the same alley to meet up with defendant when he approached the "two room cottage (in the rear of the Lemon residence at 506 N. Lavergne)…" He ran into "Candy" who was also looking for defendant. The two of them then ran into Johnny Lemon. The three of them were standing behind the "cottage" and the garage when they saw defendant pull up in his car. A male and a female exited defendant's car, and defendant pulled away. Approximately 15 minutes later, defendant pulled up again. He saw the victim and defendant exit defendant's car and "she took complete control of the entire situation" as she held up defendant and guided him into the cottage. Johnny Lemon told him and Candy to join him in the back room of the cottage "in order to get out of sight…"

¶ 56    While they were in the back room of the cottage, he "saw everything going on in the other room" with defendant and the victim. Wilkins' account of what he saw at that time mirrored the affidavit of Johnny Lemon. When Johnny Lemon left to go into the main house, Wilkins saw the victim "kept doing her thang [sic]" including drinking, smoking, and dancing to the music. He also saw the victim put "white powder" into defendant's drink, and he suspected that it was ecstasy. At approximately 5:00 a.m., he saw the victim searching the room, and she found defendant's 'money bag" under the bed. She rushed to get dressed and "jumped for joy…"

¶ 57    He and Candy suspected that the victim was trying to rob defendant so they banged on the five foot by five foot plexiglass window that divided the two rooms as a wall. He averred that they were able to see what was happening on defendant's side of the cottage by looking through this

window, which was "covered with dark see through curtains…" They banged on the window and yelled for defendant to wake up. The victim appeared to be startled. He and Candy threatened to "kick her a\*\*!" The victim grabbed a souvenir knife and defendant's cellular phone. The victim called someone, hung up and threatened them that she would call the police. Approximately fifteen minutes later, he and Candy panicked and ran away when they saw a police car in the alley. "[S]ome months later" he found out that defendant was in jail for this charge, and not a marijuana possession charge.

¶ 58 While defendant's postconviction petition was pending at the second-stage, defendant's postconviction counsel requested several continuances based on counsel's statements that she was trying to locate witnesses. On September 2, 2021, postconviction counsel filed a Rule 651(c) certificate without amendment or supplementation to the *pro se* petition filed by defendant. On October 25, 2021, the State filed a motion to dismiss in which it argued, in part, that the supporting affidavits were inconsistent with defendant's asserted defense of consent and therefore, would have prevented or hampered defendant from asserting this defense at trial. In addition, as to Joseph Wilkins, Jr., the State pointed out that he failed to aver that he was willing to testify for defendant or that he was available to testify at defendant's trial.

¶ 59 On April 25, 2022, defendant filed a response to the State's motion to dismiss, arguing that he established that his trial counsel was ineffective for failing to call these witnesses because "they would have testified that [the victim] lied about her age and that all the interactions between [the victim] and [defendant] were consensual." The State subsequently filed a reply on April 27, 2022.

¶ 60 On June 9, 2022, the circuit court heard arguments from both parties. In its oral findings, the circuit court acknowledged that it was now in possession of the affidavits filed by defendant in support of the allegations raised in his petition. The trial court reviewed each of defendant's claims,

recognizing that "there must be a substantial showing of a constitutional violation of due process" for each claim. As to Johnny Lemon's affidavits, the trial court stated that it was "not even sure what to make of" his claim that there "was a negative vibe regarding trial counsel…" The trial court further stated that his affidavits conflicted with the affidavit of Arzestery Davis regarding consent. As to Joseph Wilkins Jr., the trial court stated that Davis never averred that he was willing or available to testify and, "how is it that trial counsel would have been able to even consider calling this person." The trial court ultimately granted the State's motion to dismiss defendant's postconviction petition.

¶ 61                                    ANALYSIS

¶ 62    On appeal, defendant argues that the circuit court erred in granting the State's Motion to Dismiss defendant's postconviction petition. Specifically, defendant argues that he made a substantial showing that his trial counsel was ineffective for failing to call two exculpatory eyewitnesses to impeach the victim's testimony that defendant sexually assaulted her. Alternatively, defendant argues that his postconviction counsel provided unreasonable assistance by failing to obtain a supplemental affidavit from one of the eyewitnesses when that person did not aver that he was willing and available to testify at trial.

¶ 63    In turn, the State contends that the circuit court's decision to grant the State's Motion to Dismiss at the second stage of postconviction proceedings was proper where defendant failed to make a substantial showing that his trial counsel was ineffective for failing to call the two alleged eyewitnesses at trial. Specifically, the State points out that defendant cannot establish that trial counsel's performance fell below an objective standard of reasonableness. Trial counsel's decision to not present these witnesses amounted to trial strategy as their testimony would have conflicted with defendant's theory of defense that the victim consented to having sexual intercourse with

defendant. The State also contends that defendant cannot establish the prejudice prong where it is not reasonably likely that the result of the proceedings would have been different by the inclusion of this evidence. Regarding defendant's claim that his postconviction counsel provided him unreasonable assistance, the State argues that postconviction counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c), defendant has not rebutted the presumption that postconviction counsel fulfilled her duties pursuant to that rule, and record shows that postconviction counsel attempted to locate defendant's witnesses. Thus, the State asks us to affirm the trial court's decision to grant the State's Motion to Dismiss.

¶ 64 The Act provides a three-stage process for a criminal defendant to allege that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1 *et seq*. (West 2018). In this case, the circuit court dismissed defendant's petition at the second stage. At the second stage, counsel may be appointed to an indigent defendant. 725 ILCS 5/122-4 (West 2018); *People v. Tate*, 2012 IL 112214, ¶ 10. In a postconviction proceeding, there is no constitutional right to the assistance of counsel. *People v. Custer*, 2019 IL 123339, ¶ 30. Instead, the right to counsel is a matter of legislative grace. *Id.* At the second stage, postconviction counsel may amend the petition. *People v. Cotto*, 2016 IL 119006, ¶ 27 (citing 725 ILCS 5/122-4 (West 2010)). The State, as the respondent, also enters the litigation. 725 ILCS 5/122-5 (West 2018). The State may file a motion to dismiss or an answer to the petition. *People v. Domagala*, 2013 IL 113688, ¶ 33. In deciding a motion to dismiss, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *People v. Pingelton*, 2022 IL 122227, ¶ 15.

¶ 65 At this stage, all well-pleaded facts that are not positively rebutted by the trial court are to be taken as true. *People v. Lighthart*, 2023 IL 128398, ¶ 38 (citing *People v. Johnson*, 2017 IL 120310,

¶ 14). The court reviews the petition's factual sufficiency as well as its legal sufficiency considering the trial court record and applicable law. *People v. Ryburn*, 2019 IL App (4th) 170779, ¶ 22 (citing *People v. Alberts*, 383 Ill.App.3d 374, 377 (4th Dist. 2008)). If the defendant makes such a showing, then he is entitled to a third-stage evidentiary hearing. 725 ILCS 5/122-6 (West 2018). We review *de novo* the circuit court's dismissal of a postconviction petition at the second stage. *People v. Agee*, 2023 IL 128413, ¶ 34.

¶ 66    Defendant's argument concerns allegations that his trial counsel was ineffective for failing to present the testimony of two eyewitnesses, Johnny Lemon and Joseph Wilkins Jr., at trial. Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced the defendant. *Strickland*, 466 U.S. at 687. "More precisely, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *People v. Roland*, 2023 IL 128366, ¶ 26 (citing *People v. Moore*, 2020 IL 124538, ¶ 29). It is well-established that a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Roland*, 2023 IL 128366, ¶ 26 (citing *People v. Pingelton*, 2022 IL 127680, ¶ 53). "Indeed, in assessing prejudice under *Strickland*, the question is not whether counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently but, instead, whether it is *reasonably likely* that the result of the proceedings *would have been different.*" (Emphasis in original) *Id.* (citing *People v. Lewis*, 2022 IL 126705).

¶ 67 Initially, we find that defendant has not made a substantial showing that counsel's performance was objectively unreasonable under prevailing professional norms. As both parties recognize, the decision whether to call a witness is generally a matter of trial strategy, reserved to counsel's discretion. *People v. Enis*, 194 Ill.2d 361, 378 (2000); *People v. Ross*, 2014 IL App (1st) 120089, ¶ 34. Such decisions are usually immune from claims of ineffective assistance of counsel because they enjoy a strong presumption that they reflect sound trial strategy instead of incompetence, unless counsel's strategy was "so unsound that no meaningful adversarial testing was conducted." *Enis*, 194 Ill.2d at 378. Further, counsel has a duty to conduct both factual and legal investigations in the case. *People v. Montgomery*, 327 Ill.App.3d 180, 185 (1st Dist. 2001). If there is no question that defense counsel knows of a potential witness's existence, the failure to call him is a matter of trial strategy and will not be second guessed. *People v. Uselding*, 217 Ill.2d 1063, 1076 (1st Dist. 1991). "The strategies must be shown to be more than unsuccessful to overcome the presumption of soundness. They must appear irrational and unreasonable in light of the circumstances that defense counsel confronted at that time." *Id*. at 1076.

¶ 68 The record shows that trial counsel's decision to not present this testimony was made after counsel made a thorough investigation of the evidence, including interviewing Johnny Lemon and Joseph Wilkins Jr. regarding their proposed testimony. Prior to trial, defendant even acknowledged that his trial counsel had reached out to certain witnesses, including Johnny Lemon. Defense counsel listed Johnny Lemon as one of six potential witnesses in defendant's supplemental answer to discovery. Then, on the day that his trial commenced, defendant informed the trial court that he spoken with his attorneys about presenting the testimony of Johnny Lemon. His trial counsel informed the court that the decision to not present this witness was a "strategic decision…"

Defendant also concedes that trial counsel was also aware of Joseph Wilkins Jr. as a defense witness.

¶ 69        Now, on appeal, defendant acknowledges that these types of issues are generally considered matters of trial strategy but asks us to find that counsel's conduct amounted to a failure to call witnesses whose testimony would support an otherwise uncorroborated defense. According to defendant, these witnesses would have provided him with a defense that he did not consent to the sexual acts with the victim. Pursuant to IPI Criminal No. 4th 11.63(A), "consent" is defined, as it applies to the victim, as "a freely given agreement to the act of *[(sexual penetration) (sexual conduct)]* in question."

¶ 70         However, defendant's own comments in the trial record contradict his proposal to now assert this type of defense. Here, defendant exercised his right not to testify at trial, however, in allocution, he stated that this case amounted to a "false accusation. For the most part what did happen, it was consensual…" and that he did so after the victim told him that she was 19 years old. See *People v. Odle*, 151 Ill.2d 168, 173-74 (1992) (looking at the defendant's statement in allocution in determining whether his trial counsel's conduct amounted to ineffective assistance of counsel). Defendant's previous acknowledgment that he consented to the sexual acts with the victim contradicts his now-asserted claim that he did not do so. Clearly, defense counsel chose to proceed with a defense that the victim consented to the sexual acts involving defendant, which was consistent the theory that defendant professed when he spoke in allocution. Had defense counsel proceeded with the theory that defendant did not consent to the sexual acts involving the victim, because he was so intoxicated and/or under the influence of the "white powder" given to him by the victim, it would have contradicted his assertion that he was aware that the victim had engaged

in consensual acts with him. Defense counsel's conduct did not fall below an objective standard of reasonableness by proceeding with the defense asserted by defendant at the time of allocution.

¶ 71   Moreover, defendant asks us to accept the truth of affidavits at this stage of postconviction proceedings. While true, we also recognize that we must accept the truth of all well-pleaded facts at the second stage of postconviction proceedings unless they are positively rebutted by the trial record. *People v. Lighthart*, 2023 IL 128398, ¶ 38 (citing *People v. Johnson*, 2017 IL 120310, ¶ 14). Here, the trial record positively rebuts important aspects of the affidavits submitted by Johnny Lemon and Joseph Wilkins Jr. At trial, several photographs were admitted into evidence showing the scene where the sexual assault occurred. Moreover, the victim as well as Sergeant Robert Renter and defense witness Detective Tracy Fanning provided details as the exterior and interior of defendant's home, where the sexual assault occurred. All of the evidence positively rebuts the affiants description of defendant's home showing their ability to observe what occurred between defendant and the victim.

¶ 72   Both affiants averred that they were looking through a five-foot-by-five-foot wall of plexiglass covered by "dark see through curtains" as described in their affidavits. They described defendant's home as being separated into two parts, with Johnny Lemon occupying the back half of the home and defendant occupying the front half of the home. They averred that both of them, as well as "Candy" were in the back half of the home when they saw what occurred between defendant and the victim. However, the scene photos, as well as the testimony of the witnesses, do not show or reference this wall of plexiglass. In fact, there was no divider inside the home. Sergeant Renter testified that defendant's home was "a tool shed" which was ten feet by ten feet in diameter, and amounted to a "makeshift little one-room apartment…" He stated that there was a window to the outside, but it was "covered by a blanket or sheet, or something like that…" The victim described

defendant's home as being "little, small, compact" with one window to the exterior and containing a bed. She further testified that she could not see out of the window from the inside because there "was stuff blocking…things on the wall." Defense witness, Detective Tracy Fanning described the interior of defendant's home as being a ten-foot by ten-foot structure with a single entry door containing a bed, a "make-shift" toilet, a chair, television hanging on the wall, a heater, several knives, and containers of clothing. In resolving this issue, we also recognize that when he reviewed the sufficiency of the evidence on direct appeal, we found that "defendant's home actually resembled a garage and a tool shed in which the walls, window, and door were covered [sic] and the home was very dark." Therefore, based upon the photographs of the scene, and the testimony of various witnesses who provided descriptions of the scene, the record positively rebuts the affiants' contention that they were standing in the back half of this ten-foot by ten-foot structure, along with "Candy," and able to witness what occurred between defendant and the victim.

¶ 73    Defendant relies on *People v. Upshaw*, 2017 IL App (1st) 151405 in support of his argument that he was able to make a substantial showing that counsel's performance was deficient. In *Upshaw*, the court found that "trial counsel was deficient in failing to contact" this affiant as a possible alibi witness where there was evidence in the record that the defendant provided contact information for this witness to defense counsel prior to trial. In finding that the defendant had made a substantial showing, the court found that "[t]he record suggests no strategic reason that counsel may have decided not to investigate [the defendant's alibi] or not to even interview [the affiant]." *Id.* ¶ 40. Here, the record shows that counsel, as defendant concedes, investigated this evidence, including interviewing these witnesses, and concluded that these witnesses would not be called as witnesses at defendant's trial. Thus, defendant's reliance upon *Upshaw* is misplaced.

¶ 74    We also find that defendant did not make a substantial showing of the prejudice prong of *Strickland*.   Initially, defendant challenged the sufficiency of the evidence on direct appeal. At that time, we found that, "[i]n light of [the victim's] consistent testimony and outcry statements regard the acts of criminal sexual assault and aggravated kidnapping perpetrated against her, we cannot conclude that no rational trier of fact would have found defendant guilty of these crimes beyond a reasonable doubt." The victim testified that when they entered defendant's home, he became angry and aggressive before pushing her onto a bed and forcing her to engage in multiple acts of sexual penetration. Her testimony was corroborated by her immediate outcry to her boyfriend, Willie Dennis, the police officers, and the emergency room nurse and doctor. The phone records introduced into evidence showed that she called her boyfriend and 911 from defendant's own cellular phone while she was still inside defendant's room. The victim's demeanor and words to the dispatcher begging for help during the 911 further corroborates the evidence. She armed herself with a knife found in defendant's home to protect herself in her escape. When the police arrived, she led the police to defendant's home and immediately identified him as the person who sexually assaulted her. Moreover, defendant's DNA was found on the victim's vaginal swab.

¶ 75     Here, he is now relying upon the same challenges to the victim's credibility as we previously addressed, and rejected, on direct appeal. In light of the strength of this evidence, and the extent to which the averments of these witnesses, Johnny Lemon and Joseph Wilkins Jr., were contradicted by the photographic evidence introduced at trial, would not have raised the probability of a different outcome at trial.  Therefore, it is reasonably unlikely that evidence of defendant's lack of consent would have changed the trial court's determination that defendant forced the victim to engage in sexual acts with him and forcefully held her inside his home. Accordingly, we find that defendant's postconviction petition failed to satisfy the prejudice prong of *Strickland*.

¶ 76    In light of our decision, we need not make a determination regarding defendant's alternative argument that his postconviction counsel provided unreasonable assistance when counsel failed to shape defendant's into appropriate legal form. In particular, defendant points out that the trial court stated, in part, that Joseph Wilkins Jr. did not aver that he was willing or available to testify. The trial court made this additional finding when considering defendant's postconviction petition and its contents. In addressing defendant's argument, we recognize that our review of defendant's postconviction petition is *de novo* at the second stage of postconviction proceedings. *People v. Dupree*, 2018 IL 122307, ¶ 29 (review of a second-stage dismissal is *de novo*). When applying a *de novo* standard of review, the reviewing court owes no deference to the trial court's judgment or reasoning. *People v. Jackson*, 2021 IL App (1st) 190263, ¶ 38 (citing *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 68. We may affirm on any basis found in the record. *Id.* ¶ 38. Because we may affirm on any basis in the record, we need not determine regarding defendant's claim that his postconviction counsel provided unreasonable assistance where we are not basing our decision on whether Joseph Wilkins Jr. averred that he was willing or available to testify.

¶ 77                                    CONCLUSION

¶ 78    We therefore hold that defendant's postconviction petition failed to make a substantial showing that he received ineffective assistance of counsel. Accordingly, the trial court did not err in granting the State's Motion to Dismiss. Thus, we affirm the circuit court's ruling.

¶ 79    Affirmed.